RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0209p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JAMES HOLLAND, JR.,

                 *Petitioner-Appellant,*

    *v.*

STEVEN RIVARD, Warden,

                 *Respondent-Appellee.*

Nos. 14-1553/1554/1555/1556/1557/1558

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
Nos. 2:10-cv-14028; 2:10-cv-14031; 2:10-cv-14032;
2:10-cv-14033; 2:10-cv-14035; 2:10-cv-14036—David M. Lawson, District Judge.

Argued:  April 29, 2015

Decided and Filed:  August 25, 2015

Before:  GILMAN, ROGERS, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Matthew C. Brown, Bloomfield Hills, Michigan, for Appellant.  Linus Banghart-Linn, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.  **ON BRIEF:**  Matthew C. Brown, Bloomfield Hills, Michigan, for Appellant.  John S. Pallas, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

1

———————————

**OPINION**

———————————

ROGERS, Circuit Judge.  Defendant James Holland, Jr. appeals the district court's denial of his petitions for writ of habeas corpus under 28 U.S.C. § 2254, alleging that his confession—which served as critical state's evidence at his trials—had been given involuntarily and had been obtained in violation of his Fifth Amendment right to counsel.  On January 6, 2006, while Holland was in custody for a parole violation, Detective Mark Neumann interviewed Holland about a series of criminal sexual conduct cases and assaults that had occurred in the area.  During the interview, Holland asserted his right to an attorney and the interview ceased.  On January 12, 2006, six days after Holland had requested an attorney—and before one had been provided to him—police again met with Holland, this time to discuss the May 1991 murder of Lisa Shaw.  Holland was to serve as the key prosecution witness at the Shaw murder trial, which was scheduled to begin in February 2006.  After Holland changed his story regarding the events of Shaw's murder—a shift that effectively placed him at the scene of the crime—police asked a polygraph examiner to interview Holland.  The polygraph examiner was instructed to ask only about Shaw's murder, and nothing else, and to focus on obtaining a witness statement.  During the interview, however, Holland confessed that he had killed Shaw and committed several additional crimes.

Holland's statements led to six separate state prosecutions, all of which resulted in convictions, and all of which employed Holland's confessions as critical state's evidence.  On federal habeas review, the district court below ruled that the confessions were admissible in part because Holland was not in "*Miranda* custody" during the January 12 and 13, 2006 interviews, and therefore the "*Miranda-Edwards* protections were not triggered and [Holland's] statements properly were admitted at his several trials."  The district court also ruled that Holland's statements were made voluntarily.  Additionally, the district court rejected a Confrontation Clause claim on harmless error grounds.  Holland appeals, but his contentions on appeal are without merit.  Holland was not in *Miranda* custody during the January 12 and 13, 2006 interviews, and the totality of the circumstances surrounding the interviews supports a finding

that the incriminating statements were made voluntarily.  Also, any violation of Holland's Sixth Amendment right to confront witnesses was harmless.

On May 27, 1991, Christopher Jackson, Lisa Shaw's ex-boyfriend and the father of her son, discovered Shaw lying face-down on the floor of her apartment in Ypsilanti, Michigan, with their young son lying beside her.  When Jackson received no response to his repeated buzzing at the door, he entered Shaw's apartment through the window and nudged Shaw with his foot to try to wake her.  When Shaw did not respond, Jackson noticed that a blanket that had been covering her had shifted, revealing that her arms had been tied behind her back.  Jackson grabbed his son and fled to his mother's house, where his mother called police.  At Holland's trial, Jackson explained that he fled because he feared that police would suspect that he had killed Shaw. Approximately two years before Shaw's murder, Jackson had been charged with domestic violence stemming from an altercation in which he had struck Shaw.  Jackson had also been charged in two other domestic violence incidents involving different women.

In March 1992, Holland informed Detective Brian Miller of the Washtenaw County Sheriff's Department that he had information regarding Shaw's murder.  Holland informed police that at approximately 2:00 a.m. on the night of Shaw's murder, Jackson purchased drugs from Holland, which they proceeded to smoke together.  According to Holland, Jackson confessed that he had been involved in an altercation with his girlfriend earlier in the evening, that had ended when he choked her to death.[1]  Police did not act on Holland's tip at that time.

---

[1]At Holland's preliminary examination, Officer Miller testified that Holland shared the following:

Jackson told [Holland] that he had just left Lisa Shaw's apartment.  Holland then said that Jackson said that they had gotten into a scuffle. . . .  Jackson told him that the argument started over Mr. Jackson's drinking and being quote "with other women". . . .  Mr. Jackson said that a scuffle ensued between Mr. Jackson and Lisa Shaw.  Holland said Jackson said that they scuffled to [the] point that Mr. Jackson knocked Lisa Shaw down, the point that he threw her on the bed, he began slapping and scuffling with her. . . .  Jackson told him that at one point Ms. Shaw attempted to hit Mr. Jackson with a telephone.  At that point, [Holland] said that Jackson said he snatched the phone out of the wall, bound her with it in terms of wrapped it around her—her hands, threw her on the bed[.] . . .  At that point, according to Holland, Jackson said that he left the room, came back into the room with some fashion of a rope.  At that point he began choking Lisa Shaw.  Mr. Holland said that Mr. Jackson originally was just playing attempting to choke her, but he choked her until she didn't move anymore.  At that point, according to Mr. Holland, Mr. Jackson told him that . . . he didn't think she was dead, but once he realized she was dead that he panicked and ran out of her apartment.

In 2004, however, police reinvestigated Shaw's murder and Christopher Jackson was ultimately charged with first-degree murder. Jackson's trial was scheduled to begin in February 2006, with Holland as the key prosecution witness. On January 5, 2006, approximately one month before the start of Jackson's trial, Holland turned himself in for a parole violation stemming from an assault that occurred in Ypsilanti Township. The following day, Detective Mark Neumann interviewed Holland regarding a series of sexual assaults that occurred in Ypsilanti in 2005. Detective Neumann advised Holland of his *Miranda* rights, and approximately two hours into the interview Holland asserted his right to an attorney. The interview consequently ceased.

On January 12, 2006, only six days after Holland had requested an attorney—and before one had been provided to him—police again met with Holland, this time to discuss the May 1991 cold case murder of Lisa Shaw. Frank Combs, who contracted with the Washtenaw County Sheriff's Department to conduct interviews, interviewed Holland for approximately fifteen to twenty minutes at around 2:00 p.m. that afternoon. Holland informed Combs that "he was with Christopher Jackson at the time that the murder [of Shaw] occurred." Because this statement differed from the petitioner's earlier statement that Jackson merely told him about the murder after the fact, Combs summoned the detective in charge of the Shaw murder investigation, Everette Robbins. After hearing Holland's changed story, Detective Robbins arranged for Harold Raupp, a polygraph examiner, to conduct a polygraph examination of Holland. Detective Robbins testified that he advised Raupp that Holland had previously invoked his right to counsel, and that, therefore, the polygraph should be limited only to verifying Holland's witness statement in an ongoing homicide investigation.

Raupp met with Holland at approximately 5:00 or 5:30 in the evening on January 12, 2006. Raupp conducted a pre-polygraph interview during which he informed the petitioner of the purpose of the interview and assessed whether the petitioner was a good candidate to take a polygraph. In particular, after reading Holland his *Miranda* rights, Raupp informed Holland that the purpose of the polygraph was to determine "[w]hether or not he was present when Lisa Shaw was killed," and "whether Chris Jackson [had] told him that he had committed the crime." Before the examination started, however, Holland admitted to Raupp that he—not Jackson—had

killed Shaw, and that he was the "one they're looking for" in several other crimes.   Raupp testified at trial, explaining:

> [Holland] described a rainy night.  A progressive misty rain to heavy rain and he was in the vicinity of Lisa Shaw's apartment.  That he was out of drugs and had been using drugs heavily.  Wanted—did not want to walk home in the rain so . . . he went to this residence because he knew Lisa Shaw to use the telephone.  That she knew him.  She opened the door and let him in and . . . [h]e went to the phone and described a yearning for drugs.  Craving for drugs.  He had no money.  He needed money.  He cut the phone cord with a knife from his back pocket. . . .  At that point he described asking himself what have I done and how is this going to look.  He took control of Ms. Shaw by the neck from behind.

Raupp chose not to conduct a polygraph that evening because it had grown late.   Instead, Holland was taken back to the "bull pen" at the jail, where he spent the night.   He was brought back to the interview room the following morning at about 9:00 a.m. for a polygraph examination.  In his conversation with Raupp, Holland confessed not only to murdering Shaw, but also to a litany of other felonies that led to the murder charge in the Shaw case and to charges in five additional criminal cases discussed in this opinion.

Before trial, Holland moved to suppress his confessions on the grounds that the police interrogated him after he invoked his Fifth Amendment right to counsel, and that the confession was involuntary.   The trial court held a single *Walker* hearing[2] for all six of Holland's felony cases.   Detective Robbins, the lead investigator on the Shaw murder case, testified that on January 12, 2006, while Holland was back in the Washtenaw county jail pending arraignment on an unrelated case, he met with Holland to take only "a witness statement"; Detective Robbins stressed that Holland was not, at the time, a suspect in the Shaw murder.[3]   Raupp similarly testified that he was asked to administer a polygraph examination focused on the Shaw murder and Holland's recent statements, statements that "were an important part of the case" against Jackson.  To this end, Raupp informed Holland at the outset that the purpose of the examination

---

[2]The purpose of a *Walker* hearing is to determine the voluntariness of a defendant's statement.  *People v. Price*, 317 N.W.2d 249, 252 (Mich. Ct. App. 1982).

[3]Throughout his testimony, Detective Robbins repeatedly stated that, on January 12, 2006, he and the other officers had approached Holland as a witness, not as a suspect.  For instance, Robbins advised Raupp to limit his questioning to the Shaw murder, with a focus on obtaining a "witness statement" from Holland for the homicide investigation.  Detective Robbins later confirmed that Holland "was not a suspect at that time," and stated that he had advised Detective Combs and Raupp "that the *only* thing [Holland] was here to talk about was the *witness testimony*."  (Emphasis added.)  Finally, Robbins explained that Holland "was a witness in [his] case[, and he] was aware to not talk to him about the other cases."

was to determine "[w]hether or not [Holland] was present when Lisa Shaw was killed," and "whether Chris Jackson [had] told him that he had committed the crime." During cross-examination, however, when asked if he told Holland that he was a *suspect* in the Shaw murder case, Raupp curiously responded, "I described the test issue would be *did you kill Lisa Shaw* or were you there when she was killed." (Emphasis added.)[4]

With respect to the interview conditions, Detective Robbins testified that his interview with Holland lasted approximately twenty minutes. Neither Robbins nor Raupp had a weapon while questioning Holland, and they made no threats or promises. Raupp further explained that during the pre-polygraph interview, he found Holland to be "appropriate," meaning he did not notice signs of drug or alcohol abuse, extreme sleep deprivation, mental illness, or extreme emotional conditions. Though Holland informed Raupp that he was tired on both days, Raupp described him as "articulate, clear of thought, consistent and willing to sit with [him]." According to Raupp and Combs, Holland never mentioned that he was not feeling well.

Raupp testified that Holland was "in control of the interview on both days[,] . . . voluntarily making statements at his own pace under his own conditions." Though Raupp had been briefed only on the Shaw murder and tried to redirect the interview to the prepared questions, shortly into the interview on January 12th Holland asked him what he could talk about, to which Raupp responded that "[Holland] could talk about anything he wanted to talk about." Holland then indicated that he had "aces up his sleeve" and that he was "going to lay it all out." According to Raupp, despite numerous *Miranda* warnings and without prompting, Holland proceeded to confess to six different crimes. Holland's guilt had apparently "overtaken him," and "[h]e wanted to set it straight" to show "how sorry he was."

Holland told a different story. Holland explained that prior to turning himself in on January 5, 2006, he had been a daily drug user. Consequently, during his interviews on January 12 and 13, 2006, he had not been feeling well, suffering from what he described as depression and drug withdrawal.[5] Further, Holland stated that he had not slept well, due in large part to

---

[4]It is, however, unclear from the transcript exactly when this exchange took place (e.g., whether it occurred after Holland had confessed).

[5]Holland later admitted, however, that he never requested—and consequently never received—medical treatment for drug withdrawal prior to his interviews.

crowding in the "bull pen,"[6] and that he had not eaten.  In this weakened state, Holland was informed that Combs wanted him to testify against Jackson at the upcoming Shaw murder trial, even though he had "never told anybody that [he] was testifying against Chris Jackson."

According to Holland, despite his attempts to inform the officers that he had previously requested an attorney, the questioning continued.  Though he initially felt as though he was being interviewed as a witness, at some point during the conversation, Holland came to believe that the officers were "trying to make [him] a suspect."  Ultimately, because he believed that asking for an attorney would be futile,[7] and he was frustrated at repeatedly being asked the same questions, Holland "said okay yeah, I was there [at Shaw's murder]."  From that point forward, Holland claimed that he began answering robotically, basically "mimick[ing] everything [Raupp] told [him]."[8]  Holland explained, "[i]t wouldn't have stopped.  I feel as though it wouldn't have never stopped . . . until they got me to say what they wanted me to say basically."

Finally, Holland testified that during the interview Raupp made both threats and promises to coerce his confessions.  First, Holland stated that after he informed Raupp that he did not want to talk to Detective Robbins, Raupp told him, "you know I can get you sent back to prison if you don't cooperate with me."  Second, Holland testified that Raupp "promise[d] . . . to make sure [Holland's] family [was] all right."  Though Raupp testified that Holland made the initial request to see his mother and fiancée, Holland stated that Raupp first suggested that he might "want to warn [his] mother in a dignified way."  Holland claims that he "never mentioned anything about [his] mother or [his] fiancé[e] to Mr. Raupp until after [Raupp] initiated" the conversation.[9]

---

[6]Holland explained, however, that conditions in the bull pen, rather than any intentional acts of the officers, had prevented him from sleeping.

[7]During direct examination, the following exchange occurred:

Q:  Well you know an argument could be made that when you ask[ed] for an attorney on January 6th that it stopped so but you felt that that was useless now?

A:  Basically I felt it was useless because I had asked on January the 6th.  No attorney had came [sic] and seen me and like I said it was plenty of time for someone to arrange for an attorney to see me.  I mean what's the sense of reading me Miranda rights and me invoking—asking for an attorney and no one's even trying to even get me an attorney.

[8]This directly contradicts Raupp's testimony that Holland mentioned the additional crimes before Raupp even learned that he was a suspect in them.

[9]At Holland's trial for appellate case number 14-1554, the following exchange occurred between Raupp (A) and defense counsel (Q) regarding the alleged promise:

After hearing testimony and reviewing an audiotape of Raupp's January 12, 2006 interview with Holland, the trial court found that Holland's statements "were made voluntarily" and were thus admissible. The court explained that Holland's age, education level, previous experience with the police, and length and nature of questioning supported such a finding. Further, in addressing Holland's allegations of mental abuse, the court noted that there

> was really nothing remarkable at all in the [recorded] statement. [It] [s]ounded like a very straightforward conversation that was occurring between the defendant and Mr. Raupp . . . [T]he defendant was not speaking in any form of a monotone. Was not simply giving a yes or no response much like you would consider in a[n] automaton whose [sic] not thinking for themsel[ves] but they're just saying something, saying anything in order to make someone go away.

> In fact, the defendant at least in the last tape that the Court listened to spoke in extensive sentences if not paragraphs. It certainly is not a static response [o]f someone whose [sic] just merely agreeing with another person's statements.

> All this leads the Court to the conclusion that there has been no coercion made by the authorities with regard to the statements that were being made by the defendant.

---

Q: Now during that conversation you made a statement. It's a couple sentences long so bear with me and if you don't remember it I'll show you the transcript of the tape. You said the following statement: "Why not. Why not. Honorable now. I will keep my word. If I don't keep my word what you say is this. I was tired. I ain't slept in four days. I don't remember what I told them." Then you continue to say: "Come on you got a brain. There are all kinds of—I ain't asking you on tape recorder. I ain't asking you to write nothing. I'm just asking you to tell me the truth. You want to change your mind. You go right ahead. It ain't going to hurt my feelings. You said I couldn't hurt you. You can't hurt my feelings. But I think we're past that now. I really do. If I don't keep my promise, shame on me." Now did you make that statement?

A: I recall that, yes.

Q: Okay. Now is it fair to say that you're kind of giving Mr. Holland's [sic] an out if he doesn't like something like here's an excuse to use if you don't like what happens?

A: No. The interview is in progress at Mr. Holland's request and he had given information, very critical information, it was a very important interview regarding an upcoming trial. A star witness if you want to use that term. And he was very obviously insinuating that he had aces up his sleeve that he had information and contacts that he was going to use. I was saying there you are in control of this interview. What's important here is the truth. You're free to say it or not say it. Change your mind, not change your mind. I wasn't taping it and I wasn't writing it down. [ . . . ]

Q: And, and is that the same thing with the promise? I mean is that all the same, your word, your promise?

A: I wasn't promising him anything I was making a statement that I was good to my word what I said I would stand by. [ . . . ]

Q: Now, now you would agree that an officer shouldn't make any promises to anybody to get a confession, right?

A: Absolutely not.

Q: Do you see in any way the words you could have used could have influenced him to make a decision?

A: A promise about my integrity or my behavior is one thing. Promising someone something real in exchange for something else would be totally inappropriate. I was not doing that.

Accordingly, relevant portions of the petitioner's confession made on January 12 and 13, 2006 were admitted into evidence in each of Holland's trials over his objection.

Following the *Walker* hearing, Holland was tried and convicted in the following cases:

1)  Case No. 10-14028 (appeal No. 14-1553): Holland waived his right to a jury trial and was convicted by the judge of the first-degree premeditated murder of Lisa Shaw, and first-degree felony murder. *People v. Holland*, No. 282817, 2009 WL 80958, at *1 (Mich. Ct. App. Jan. 13, 2009). The felony murder conviction was vacated at sentencing.

2)  Case No. 10-14031 (appeal No. 14-1554): Holland was convicted by a jury of six counts of criminal sexual conduct, kidnapping, first degree home invasion, and armed robbery. *People v. Holland*, No. 279870, 2009 WL 80356, at *1 (Mich. Ct. App. Jan. 13, 2009). After entering Karasten Birge's apartment through a sliding glass door, Holland wrapped a belt around Birge's neck and demanded money. *Id*. When Birge only gave him approximately one dollar, he forced her to engage in various sexual acts. *Id*. Holland then drove Birge at knifepoint to an automatic teller machine (ATM), where she withdrew $100. *Id.* After forcing Birge to drive to a second ATM, Holland fled on foot. *Id*.

    At trial, the state offered Holland's confession in evidence, a confession in which he admitted to robbing and assaulting Birge. *Id*. Although Birge could not identify Holland, she testified at trial that she recognized his voice in the audio recording of the January 2006 interview that had been played at trial. *Id*. In addition, the state offered the testimony of a laboratory analyst who described the results of DNA testing that incriminated Holland. *Id.* at *5. The expert witness was allowed to relate the work that two of her non-testifying colleagues had performed. Holland's attorney objected on hearsay grounds to the statements of one of the non-testifying colleagues; he did not, however, raise an objection under the Confrontation Clause. Holland's attorney also failed to raise any objection to the expert's mention of the work of the second colleague. *Id*.

3)  Case No. 10-14032 (appeal No. 14-1555): Holland was convicted by a jury of four counts of first-degree criminal sexual conduct, armed robbery, and larceny. *People v. Holland*, No. 278876, 2009 WL 80361, at *1 (Mich. Ct. App. Jan. 13, 2009). The jury found that on May 11, 2005, Holland sexually assaulted Erin Horning, a former student at Eastern Michigan University, while she was working in a laboratory.

4)  Case No. 10-14033 (appeal No. 14-1556): Holland was convicted by a jury of four counts of first-degree criminal sexual conduct, three counts of second-degree criminal sexual conduct, and armed robbery. *People v. Holland*, No. 281154, 2009 WL 81275, at *1 (Mich. Ct. App. Jan. 13,

2009). The jury found that on December 12, 2005, Holland sexually assaulted Jessica Mueller as she was working at Cross Street Tanning.

5) Case No. 10-14035 (appeal No. 14-1557): Holland was convicted by a jury of armed robbery, carrying a concealed weapon, possession of a firearm during the commission of a felony, and being a felon in possession of a firearm, in connection with the robbery of Elizabeth Young, a store clerk at Seven Eleven, on December 24, 2005. *People v. Holland*, No. 281153, 2009 WL 81276, at *1 (Mich. Ct. App. Jan. 13, 2009).

6) Case No. 10-14036 (appeal No. 14-1558): Holland was convicted by a jury of armed robbery of Emily Mills, a barista at Bombadill's Café, on December 24, 2005. *People v. Holland*, No. 281152, 2009 WL 81277, at *1 (Mich. Ct. App. Jan. 13, 2009).

Holland was sentenced to life in prison without parole for the murder of Lisa Shaw, *Holland*, 2009 WL 80958, at *1, and was given lengthy prison terms in each of the other cases. *Holland*, 2009 WL 80356, at *1; *Holland*, 2009 WL 80361, at *1; *Holland*, 2009 WL 81275, at *1; *Holland*, 2009 WL 81276, at *1; *Holland*, 2009 WL 81277, at *1. He filed a direct appeal in each case in the Michigan Court of Appeals, arguing that his confession was involuntary because it was elicited by an inappropriate promise, the interrogation occurred after a request for counsel, and the confession was made after an extended period of questioning and while Holland was addicted to illegal drugs. *Holland*, 2009 WL 80958, at *1, *4. In addition, Holland raised various other issues in some of the cases, of which only one is important to this appeal: namely that in case number 10-14031 (appeal No. 14-1554), he was "denied his Sixth Amendment right to confront witnesses when the prosecutor's forensic DNA expert . . . was permitted to testify regarding the work of two [non-testifying] colleagues." *Holland*, 2009 WL 80356, at *5.

The Michigan Court of Appeals heard oral argument in all six cases on the same day, and affirmed Holland's convictions in six separate unpublished opinions. *Holland*, 2009 WL 80958, at *1; *Holland*, 2009 WL 80356, at *1; *Holland*, 2009 WL 80361, at *1; *Holland*, 2009 WL 81275, at *1; *Holland*, 2009 WL 81276, at *1; *Holland*, 2009 WL 81277, at *1. First, the court found—in all of the cases—that even though Holland had requested counsel during an interview conducted on January 6, 2006, the *Miranda/Edwards* protections did not apply to the police questioning on January 12 and 13, 2006 because Holland had "initiated the discussion about his involvement in the case[s] at bar and . . . he was not being interrogated at the time he confessed." *Holland*, 2009 WL 80958, at *4. The court reasoned that because "[t]he questions posed to

[Holland] were directed toward his knowledge as a witness in a homicide investigation in which [he] was not a suspect[,]" the "questions were not reasonably likely to elicit information about the case[s] at bar." *Id.*

Second, the court of appeals found that the "trial court's findings of fact were not clearly erroneous, and the totality of the circumstances indicate[d] that defendant's confessions on January 12 and 13, 2006, were voluntary." *Id.* at *2. The court considered Holland's age, education level, and experience with the criminal justice system, as well as the lack of evidence of physical abuse and intoxication in reaching this conclusion. *Id.* The court of appeals also specifically rejected Holland's claim that his confession was involuntary—and thus inadmissible—because it was induced by a promise. *Id.* at *4. The court explained:

> The existence of a promise is just one of the circumstances to consider in examining whether, under the totality of the circumstances, the statement was made voluntarily. Raupp testified that defendant first introduced the topic of speaking with his family, although defendant claims that Raupp brought it up. We find no basis to upset the trial court's determination that Raupp's testimony was more credible on this issue. Considering that Raupp had no knowledge of defendant's other crimes before defendant told him, Raupp had no reason to promise defendant anything in order to obtain a confession. In fact, Raupp was unaware that there was even the possibility of obtaining a confession or confessions. In addition, Raupp did not have the authority to grant defendant's request to see his family. To the extent there was any promise, it was merely Raupp's promise to pass along defendant's request to see family to Raupp's supervisors. Accordingly, the record does not support a finding that defendant was induced or coerced into making the incriminating statements, and the trial court did not err in holding that defendant's incriminating statements were not improperly induced by a promise.

*Id.* (internal citations omitted).

Finally, in case number 10-14031 (appeal number 14-1554), the court of appeals reviewed Holland's unpreserved Sixth Amendment Confrontation Clause claims for plain error because Holland's attorney had failed to raise a Confrontation Clause challenge to the expert's testimony about Kelly Lewis's work and had failed to raise any challenge to the expert's testimony regarding Julie Hutchinson's work. *Holland*, 2009 WL 80356, at *5. The court first determined that the expert's testimony, in which she mentioned Hutchinson's testing to explain why she chose to conduct a different test, did not violate Holland's right to confrontation because

"[a] statement offered to show the effect of the out-of-court statement on the hearer does not violate the Confrontation Clause." *Id.* (internal quotations and citation omitted). The court next found that the expert's "testimony that she used a DNA profile obtained by her colleague, Kelly Lewis, from a buccal swab taken from defendant to compare against the Y-STR profile that was obtained from a swab on the victim's shirt" did not plainly violate Holland's right to confrontation because "it [wa]s not plain from the record that Lewis conducted any subjective analysis in arriving at the DNA profile for defendant." *Id.* at \*6.

After the state supreme court denied leave to appeal in all of his cases, Holland filed six habeas corpus petitions in district court challenging the admissibility of his confessions and raising various other claims. The district court, reviewing Holland's appeal under the deferential AEDPA standard, denied his petitions, finding that: (1) because Holland was not in "*Miranda* custody" during the January 12 and 13, 2006 interviews, the "*Miranda-Edwards* protections were not triggered and [Holland's] statements properly were admitted at his several trials"; (2) Holland's statements were made voluntarily; and, (3) any violation of Holland's Sixth Amendment right to confrontation was harmless because "it cannot be said that the admission of the DNA evidence . . . had a substantial and injurious effect or influence on the jury's verdict."

On appeal, Holland contends that (1) his confession was obtained in violation of his Fifth Amendment right to counsel, and thus was inadmissible (a claim common to all of his appeals); (2) his confession was involuntary because it was induced by a promise that he could visit his mother and fiancée (a claim common to all of his appeals); and (3) his Sixth Amendment right to confront witnesses was violated when the prosecutor introduced expert DNA testimony based in part on the out-of-court statements of non-testifying colleagues (a claim arising only in appeal number 14-1554).

As an initial matter, we assume for purposes of argument that Holland was being interrogated, and that—as the district court reasoned below—the state court's decision to the contrary was unreasonable. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

The Michigan Court of Appeals reasoned that Holland was not being interrogated at the time he confessed because "[t]he questions posed to [Holland] were directed toward his knowledge as a witness in a homicide investigation in which [he] was not a suspect," and were thus "not reasonably likely to elicit information about the case at bar." *Holland*, 2009 WL 80958, at *4. As the district court explained, however, the record does not support this finding:

> Based on the testimony at the suppression hearing, it is plain that the police wanted to question the petitioner about Lisa Shaw's murder. It is also apparent that he was not viewed as a suspect initially. However, after questioning on the morning of January 12, the petitioner gave a statement that was inconsistent—and potentially more incriminating—than his earlier statement made years before. Earlier he had told the police that Jackson admitted to him that he [had] killed Shaw; but at the police station on January 12, the petitioner said he actually was present when Jackson killed her. The police, therefore, arranged for a polygraph examination to be conducted that afternoon by Harold Raupp. Raupp posed questions to the petitioner; during the conversation, the petitioner told Raupp that he had "aces . . . up his sleeve," and wanted to speak to Frank Combs, a contract employee with the sheriff department. When Combs returned, the petitioner began to describe crimes with which Raupp and Combs were unfamiliar. So they obtained a "packet" that listed several crimes. As Raupp tells it, "I went out and got a synopsis of what they were and came back and was asking questions about not only those cases but others." They described a cooperative subject who was responding to questions about crimes he admitted committing.

For reasons different from those articulated by the state court, however, the state court's decision—that the *Miranda/Edwards* protections did not apply to the questioning on January 12 and 13, 2006—was not unreasonable. Because it is the decision of the state court, not its reasoning, to which AEDPA deference applies, the district court's denial of Holland's petition for writ must be upheld. Under AEDPA, habeas relief may not be granted unless the state court adjudication "*resulted in a decision* that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (emphasis added). "In assessing the reasonableness of the state court's application of federal law, . . . federal courts are to review the *result* that the state court reached, not whether [its decision] [was] well reasoned." *Robinson v. Polk*, 438 F.3d 350, 358 (4th Cir. 2006) (internal quotation marks and citations omitted) (emphasis in original). The Supreme Court, in *Harrington v. Richter*, 562 U.S. 86 (2011)—a case in which the state court provided no

explanation for the denial of relief to a defendant—recently underscored that AEDPA deference applies to the state court's *decision*, not its reasoning:

> By its terms § 2254(d) bars relitigation of any claim "adjudicated on the merits" in state court, subject only to the exceptions in §§ 2254(d)(1) and (2). There is no text in the statute requiring a statement of reasons. The statute refers only to a "decision," which resulted from an "adjudication." As every Court of Appeals to consider the issue has recognized, determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning. . . . And as this Court has observed, a state court need not cite or even be aware of our cases under § 2254(d). . . . Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was *no reasonable basis for the state court to deny relief*. This is so *whether or not* the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a "claim," not a component of one, has been adjudicated.

*Id.* at 98 (emphases added). Though a state court decision unaccompanied by any explanation differs from a state court decision based on erroneous reasoning, the Court's explanation in *Richter* suggests that this is not a meaningful distinction; a habeas petitioner must show that there was "*no reasonable basis* for the state court to deny relief . . . *whether or not* the state court reveals [its reasoning]." *Id.* (emphases added).

The Seventh Circuit recently considered "what to do if the last state court to render a decision offers a bad reason for its decision." *Brady v. Pfister*, 711 F.3d 818, 826 (7th Cir. 2013). Though the court ultimately rejected Brady's ineffective-assistance claim under both *de novo* and AEDPA's deferential standard of review, the court first opined:

> Under *Johnson v. Williams*[, 133 S. Ct. 1088 (2013),] and *Richter*, it is clear that a bad reason does not necessarily mean that the ultimate result was an unreasonable application of established doctrine. A state court could write that it rejected a defendant's claim because Tarot cards dictated that result, but its decision might nonetheless be a sound one. If a state court's rationale does not pass muster under the *Williams v. Taylor* standard for Section 2254(d)(1) cases, the only consequence is that further inquiry is necessary.
>
>       At that point, it is no longer appropriate to attach any special weight to the last state court's expressed reasons. The court's judgment, however, is another matter. With the last state court's reasoning set aside, the federal court should turn to the remainder of the state record, including explanations offered by lower

courts.  The only question in that situation is whether AEDPA deference applies to those lower state-court decisions, or if review is *de novo*.

*Id.* at 827; *see also Makiel v. Butler*, 782 F.3d 882, 906 (7th Cir. 2015).  Here, in light of the Supreme Court's decision in *Richter* and 28 U.S.C. § 2254(d)(1), AEDPA deference applies to the state court's decision that the *Miranda*/*Edwards* protections did not apply, not its particular reasoning.

It is true that since the Supreme Court's *Richter* decision we have reaffirmed our prior holdings that in ineffective-assistance-of-counsel claims in which a state court relies on only one prong—either deficient performance or prejudice—to deny a defendant's claim, AEDPA deference applies only to the adjudicated prong, with the unadjudicated prong reviewed *de novo*. *Rayner v. Mills*, 685 F.3d 631, 636−39 (6th Cir. 2012); *Hodges v. Colson*, 727 F.3d 517, 537 (6th Cir. 2013).  However, the particular reasoning in the *Rayner* line of cases, *see Hodges*, 727 F.3d at 537 n.5, is limited to the ineffective-assistance-of-counsel context and does not compel *de novo* review of Holland's *Edwards* claim.  In any event, our analysis below demonstrates that even under a *de novo* review, the state court properly admitted the evidence notwithstanding *Edwards*.  *A fortiori*, the analysis supports our conclusion that the state court could reasonably have found that Holland was not in *Miranda* custody during the January 12 and 13, 2006 interviews, and that it was not unreasonable for the state court to determine that the *Edwards* protections—which prevent the police from re-interrogating "an accused in custody if he has clearly asserted his right to counsel"—did not apply.

Under *Edwards v. Arizona*, 451 U.S. 477 (1981), "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated *custodial* interrogation even if he has been advised of his rights[, . . . ] unless the accused himself initiates further communication, exchanges, or conversations with the police."  *Id.* at 484−85 (emphasis added). Stated simply, "once the accused requests counsel, officials may not reinitiate questioning until counsel has been made available to him."  *Minnick v. Mississippi*, 498 U.S. 146, 147 (1990). However, "[i]n every case involving *Edwards*, the courts must determine whether the suspect was in custody when he requested counsel and when he later made the statements he seeks to suppress."  *Maryland v. Shatzer*, 559 U.S. 98, 111 (2010).

Despite the fact that Holland was physically in "custody" after having turned himself in for a parole violation on January 5, 2006, Holland was not in *Miranda* custody at the time of his January 12 and 13, 2006 interviews because the circumstances surrounding his questioning were not those generally thought to exert the coercive pressure that *Miranda* was designed to guard against. "[I]mprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*." *Howes v. Fields*, 132 S. Ct. 1181, 1190 (2012). Rather, whether incarceration constitutes custody for *Miranda* purposes

> depends upon whether it exerts the coercive pressure that *Miranda* was designed to guard against—the danger of coercion [that] results from the *interaction* of custody and official interrogation. To determine whether a suspect was in *Miranda* custody we have asked whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. This test, no doubt, is satisfied by all forms of incarceration. Our cases make clear, however, that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody.

*Shatzer*, 559 U.S. at 112 (internal quotation marks and citations omitted). The "determination of custody should focus on all of the features of the interrogation," including "the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted." *Fields*, 132 S. Ct. at 1192.

Here, numerous factors support a determination that Holland was not in *Miranda* custody at the time of his interviews on January 12 and 13, 2006. First, the nature and progression of the questioning indicate that a reasonable person would have felt that he was free to end the interviews. In making a *Miranda* custody determination, the court must first "ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 1189 (internal quotation marks and citations omitted). Police first approached Holland on January 12, 2006 to question him as a witness in preparation for an upcoming murder trial. Holland was not, therefore, confronted with any evidence or, indeed, any allegations that he had been involved in the murder. There also appears to have been no discussion of charges being filed against him. Though his status as a witness changed during the course of the interrogation, the dramatic shift appears to have occurred only after Holland volunteered that he had "aces up his sleeve." In addition, Holland was read his *Miranda* rights on "at least . . . four separate occasions" during

the January 12 and 13, 2006 interviews, clearly placing Holland on notice that he did not have to speak with police. Thus, a reasonable person in Holland's position would have felt free to terminate the questioning. The Supreme Court has previously found that the police's focus on another individual's crime rather than the interviewee's, and the absence of threats or suggestions of arrest are factors that weigh against finding *Miranda* custody. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

Second, the location of the interview was not, in itself, coercive. Though Holland was interviewed in a conference room at the Washtenaw County Jail that was approximately six feet by six feet in size, the fact that he was already in physical custody likely offset the coercive effect of such an environment. For an individual who is already incarcerated, questioning in a jailhouse conference room likely does not involve "the same 'inherently compelling pressures' that are often present when a suspect is yanked from familiar surroundings in the outside world and subjected to interrogation in a police station." *Fields*, 132 S. Ct. at 1191 (quoting *Shatzer*, 559 U.S. at 104−05).

Third, though the interviews were not short, they also were not unduly lengthy. On January 12, 2006, Holland was interviewed by three different officers, two of whom, Combs and Robbins, each interviewed him for less than one-half hour. Holland's third interview, in which he was to take a polygraph examination, lasted at most four hours, ending around 9:00 p.m. Because it had grown late, Raupp chose not to conduct the polygraph that evening. On January 13, 2006, the interview resumed at around 9:00 a.m., and lasted three hours. The interviews were not unnecessarily long, and did not run late into the night or disrupt Holland's normal sleep schedule. Raupp even consciously avoided placing Holland in a coercive situation by opting to postpone the polygraph examination until the following morning. Though the Court has previously suggested that a five- to seven-hour interrogation that ends at midnight could weigh in favor of finding *Miranda* custody, *Fields*, 132 S. Ct. at 1193, there are two key distinctions here: (1) though Holland was interviewed for approximately eight hours over the course of two days, he was not interviewed continuously; and (2) the interviews were conducted during normal waking hours.

The *Miranda* custody analysis to be performed here is very similar to that conducted by the Court in *Fields*. As the district court explained:

> In *Fields*, the inmate, while serving a sentence in a Michigan jail, was escorted by a corrections officer to a conference room. There, two armed sheriff's deputies questioned him about allegations that, prior to his incarceration, he engaged in sexual conduct with a 12-year old boy. The Supreme Court held that Fields was not taken into *Miranda* custody. In reaching this decision the Court acknowledged that the following facts supported a finding of custody: Fields did not invite the interview and was not advised that he could decline to speak to the deputies; the interview lasted five to seven hours and continued past the inmate's typical bedtime; the deputies who questioned Fields were armed; and one of the deputies used "a very sharp tone" and profanity. [*Fields*, 132 S. Ct.] at 1192−93. The Court found, however, that these circumstances were offset by others: most importantly, Fields was told at the outset that he could get up and leave the interview whenever he wanted; Fields was not physically restrained or threatened; the interview took place in a well-lit, average-sized conference room; Fields was offered food and water; and the door to the conference room was sometimes left open. *Id.* at 1193. The Court concluded that these factors created an interrogation environment in which "'a reasonable person would have felt free to terminate the interview and leave.'" *Id.* (quoting *Yarborough*, 541 U.S. at 664−65). Therefore, the Court ruled, Fields was not in "*Miranda* custody" when he made his incriminating statements.

Like the defendant in *Fields*, Holland did not invite the interview regarding the murder of Lisa Shaw and the interviews lasted approximately eight hours over the course of two days, factors that could support a finding of *Miranda* custody. However, the factors weighing against finding *Miranda* custody are even stronger here than in *Fields*. For instance, unlike Fields, Holland was repeatedly read his *Miranda* rights.[10] Raupp refused to administer the polygraph examination on January 12, 2006, because it had grown late, Robbins and Raupp—at the very least—were not armed, and there is little indication that the officers used sharp tones or profanity. The trial court, after reviewing the interview recordings, described the interrogation as "a very straightforward conversation that was occurring between [Holland and Raupp]." In addition, nearly all of the factors that the Court found offset a finding of *Miranda* custody in *Fields* are

---

[10]Holland suggests that the fact that he was repeatedly read his *Miranda* rights underscores that he was interviewed as a suspect, not as a witness, and was thus in *Miranda* custody. However, both Combs and Raupp testified, respectively, that reading witnesses and individuals about to take a polygraph examination their *Miranda* rights was standard procedure. Though Holland—an individual who had received *Miranda* warnings on numerous prior occasions—may have taken the *Miranda* warnings as an indication that he was being interviewed as a suspect, rather than as a witness, the nature and tenor of the interviews, as outlined above, undercut such an interpretation. The law should not deter officers from exercising extra caution in this context.

present here: (1) Holland was never physically threatened; (2) the interview appears to have taken place in a well-lit, average-sized room; and (3) Holland was offered food and given at least one bathroom break. These factors, when combined with his status as a witness for much of the interview, indicate that Holland was subjected to an interrogation environment in which "a reasonable person would have felt free to terminate the interview and leave."

Holland nevertheless argues that after he invoked his right to counsel on January 6, 2006, *Edwards* barred any further police-initiated contact, including questions about unrelated matters in which the accused may be a suspect. Though Holland's status as a suspect may factor into the analysis of whether he was subjected to custodial interrogation without an attorney present—interrogation prohibited by *Edwards* in the absence of an attorney—it is not dispositive. The Supreme Court recently held that—in light of the totality of the circumstances—an individual was not in *Miranda* custody despite being questioned about "allegations that, before he came to prison, he had engaged in sexual conduct with a 12-year-old boy." *Fields*, 132 S. Ct. at 1185, 1194.

One additional reason—a reason provided by the state court in denying Holland's *Edwards* claim—supports finding that the *Miranda*/*Edwards* protections did not apply to Holland's confessions to the five criminal sexual conduct crimes: because Holland himself initiated further communication regarding these offenses, he waived his previous invocation of the right to counsel. Though *Edwards* held that an accused, "having expressed his desire to deal with the police only through counsel, [may not be] subject to further interrogation by the authorities until counsel has been made available to him," the Court also held that the accused may later waive this right—and the prior invocation—by "himself initiat[ing] further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484–85. Detective Robbins instructed Raupp to limit Holland's polygraph examination to questions regarding the Shaw murder and Raupp himself knew nothing of Holland's possible involvement in the five other crimes. It was not until Holland himself "initiated further communication" regarding those offenses on January 12, 2006 that they were discussed. The state court's determination that Holland had "initiated the discussion[s] about his involvement in the [criminal

sexual conduct cases]" and, in doing so, had waived his prior invocation of the right to counsel, *Holland*, 2009 WL 80958, at *4, was thus reasonable.

The reasonableness of the state court's decision that the *Miranda/Edwards* protections did not apply to Holland's questioning on January 12 and 13, 2006, is further supported by policy reasons that favor permitting the police and prosecutors to perform the type of interview at issue here—a witness interview. Prosecutors should be encouraged to verify the accuracy of a witness's account before trial, and defendants may wish to assist the prosecution in exchange for reduced charges. The officers' decision to conduct a pre-trial interview was particularly important here, where the interview pointed them to the right suspect—and thus averted the grave injustice that would have resulted if Jackson, rather than Holland, had been tried for Shaw's murder. Though ideally an attorney should be provided to a defendant upon request— and before any subsequent questioning occurs—the prosecutor here appeared to be doing his job in preparing for the Shaw murder trial, and there is no indication that either the prosecutor or the police anticipated that Holland, while being questioned as a witness, would confess to six separate crimes.

In addition to raising a Fifth Amendment right-to-counsel claim, Holland challenges the voluntariness of his confessions. The state court, however, correctly found that Holland's statements were voluntary because the totality of the circumstances surrounding the confessions indicated that his statements were the product of his free and rational choice, rather than an overborne will. Determination of whether a statement is involuntary "requires careful evaluation of all the circumstances of the interrogation." *Mincey v. Arizona*, 437 U.S. 385, 401 (1978). The question is "whether the defendant's will was overborne at the time he confessed." *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963). In answering this question, the court should consider "the age, education, and intelligence of the defendant; whether the defendant has been informed of his *Miranda* rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep." *McCalvin v. Yukins*, 444 F.3d 713, 719 (6th Cir. 2006); *see also Withrow v. Williams*, 507 U.S. 680, 693–94 (1993).

Several factors support finding that Holland confessed freely and of his own volition: (1) Holland was thirty-nine at the time of the interview; (2) Holland was taking college courses, and nothing in the record suggests that he did not have the education or intelligence level to knowingly understand a *Miranda* warning; (3) Holland had previously received *Miranda* warnings in regard to at least five separate run-ins with the police; (4) Holland was read his *Miranda* rights on "at least . . . four separate occasions" during the January 12 and 13, 2006 interviews; (5) the questioning, though it lasted for several hours on each of two days, did not appear "out of the ordinary" or require Holland to be confined to an interrogation room for "eight, ten, twelve, twenty-four hours" at a time; and (6) Holland was neither injured nor intoxicated during the interview, nor subjected to physical abuse. Further, though Holland suggested at the *Walker* hearing that he did not feel well and had been deprived of food and sleep at the time of the interviews, ample record evidence supports the state courts' findings that (1) no complaints regarding his ill health were "directly made to any agent";[11] (2) there was not "any substance to the argument that he was deprived of food"; and (3) he was not "purposefully deprived of sleep." Holland himself even admitted that the conditions in the bullpen, rather than any intentional acts of the officers, had prevented him from sleeping.

Further, "to the extent there was any promise" made by Raupp to Holland to facilitate a meeting between Holland and his mother and fiancée should he confess, the "promise" did not induce Holland's incriminating statements. Though a combination of threats and promises may be sufficient to overbear an interviewee's will and constitute impermissible coercion, *Lynumn*, 372 U.S. at 534, the record shows that Holland's statements were not coerced. Raupp testified that Holland—not Raupp—first mentioned a visit with his mother and fiancée; Raupp had no knowledge of Holland's possible connection to the other crimes prior to Holland's confession (and thus no reason to promise Holland anything in order to obtain a confession); and, in any event, Raupp lacked any authority to grant Holland's request, a lack of authority that was conveyed to Holland.[12] The state court explained that "[t]o the extent there was any promise, it

---

[11]Raupp and Combs repeatedly testified that Holland never mentioned that he was not feeling well.

[12]At Holland's *Walker* hearing, Raupp testified:

Mr. Holland [was] making a pretty unusual request [to see his mother and fiancée to prepare them]. I, I believe that he was in custody for a probation violation and he was asking for a sit down, a physical sit down with his mother and his fiancé[e]. I don't believe that's done. In my

was merely Raupp's promise to pass along defendant's request to see family to Raupp's supervisors," *Holland*, 2009 WL 80361, at *7, a finding that is not unreasonable. Though Holland contends that the promise made to him was similar to that made in *Lynumn*, *Lynumn* is distinguishable for the reasons given by the district court:

> In *Lynumn*, the defendant was interrogated in her apartment while surrounded by three police officers and a police informant. The officers threatened that if she did not cooperate, state financial aid for her infant children would be cut off and the children would be taken from her. In this case, the petitioner was not facing threats to the physical and financial well-being of his minor children, or, for that matter, of his mother and fiancée. His desire to prepare his loved ones for his planned confession does not render the confession involuntary or the police conduct coercive. Individuals confess for a host of reasons [and] . . . [h]ere, there is no indication that the petitioner was threatened in any way.

Though Holland would ask this court to credit his testimony from the *Walker* hearing—rather than the officers' statements, which were accepted by the state courts—he has provided no clear and convincing evidence that the trial court's factual determinations were unreasonable. "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct," unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The state court's determination that Holland's statements were voluntary was reasonable, and thus the admission of those statements at his several trials did not violate his rights under the Fifth Amendment.

We accept for purposes of argument, however, that the State did violate Holland's Sixth Amendment right to confront witnesses when the prosecutor, in appellate case number 14-1554, introduced expert DNA testimony based in part on the out-of-court statements of the expert's colleagues. Holland's Confrontation Clause claim is based

> on the State's failure to call all of the laboratory technicians who performed DNA analyses on swabs taken from items in the field and the known samples taken from the rape victim and [Holland]. Three technicians testified: Rosemary Jones,

---

experience it's just not done. . . . [W]hat I was saying there [in asking him to give me power] was give me something to give them to give you what you want. . . . I was saying give me some power. Why should they do this. You know why, what are you going to protect [your mother] from was my—what are you trying to protect her from was my reason for saying that.

Raupp does not promise Holland leniency or a visit with his relatives; at most, as the state court explained, he promises to pass along Holland's request to see family to his supervisors.

a Michigan State Police laboratory employee who said that she sent a "buccal swab" of the victim to an outside laboratory; Laurie Bruski, another state police laboratory employee who testified that one of the tests from the outside laboratory yielded male DNA (containing a "Y" chromosome), and therefore "Y-STR" testing was performed on that sample; and Julie Kowaleski, the analyst from the outside laboratory. Kowaleski testified that Y-STR testing is used when looking for a male match, and the sample contains female DNA as well. She tested a shirt that the victim said was used to cover her face; it contained a "mixed profile" of male DNA. Kowaleski relied on Lewis's work on the known sample from the petitioner and concluded that samples taken from the scene contained DNA that matched the petitioner's DNA, or that of his father or paternal grandfather.

Because Kowaleski relied on the work of Lewis—a technician not subjected to cross-examination at Holland's trial—and Lewis's work was testimonial, Holland's Sixth Amendment right was—we assume—violated. The Confrontation Clause prohibits the introduction of testimonial statements of witnesses absent from trial, unless the "declarant is unavailable, and . . . the defendant has had a prior opportunity to cross-examine [the declarant]." *Crawford v. Washington*, 541 U.S. 36, 51, 59 (2004). Reports memorializing the work performed by laboratory analysts when carrying out forensic duties are testimonial statements subject to the requirements of the Sixth Amendment, as interpreted by *Crawford*. *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2717 (2011); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310–11 (2009).

However, because the violation of Holland's Sixth Amendment right to confront witnesses did not have a substantial and injurious effect or influence on the jury's verdict, Holland is not entitled to relief. Violations of the Confrontation Clause are subject to harmless-error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). On habeas review, relief may be granted only if the constitutional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Here, the prosecution's case—even without the DNA expert's testimony—was strong. The prosecutor played Holland's confession to the jury, the victim corroborated Holland's confession by providing a voice identification, and a witness who lived in an apartment complex near the victim's apartment linked Holland to the area where the incident occurred. Whether a violation of the Confrontation Clause was harmless error depends on numerous factors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence

corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684. In light of the strength of the prosecution's case, and the relatively small role the DNA evidence likely played in Holland's conviction, the admission of the DNA evidence—even if some of it was untested by cross-examination—did not have a substantial and injurious effect or influence on the jury's verdict.

The judgment of the district court is affirmed.