**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 16a0502n.06

Case No. 15-2339

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DONYELLE WOODS, | ) | **FILED**<br>Aug 25, 2016<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| WILLIE SMITH, Warden, | ) | MICHIGAN |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE: BOGGS, ROGERS, and STRANCH, Circuit Judges.

BOGGS, Circuit Judge. On May 8, 2003, Eric Harris, a local narcotics dealer, was shot dead as he made a telephone call from a pay phone in Detroit. Four days later, a police sketch artist interviewed Chavez Johnson, who claimed to have witnessed the shooting, and created a composite sketch of the perpetrator. Sandra Taylor, the only other eyewitness to have seen Harris's killer, later identified the shooter as Petitioner Donyelle Woods. The State of Michigan twice tried Woods for Harris's murder and introduced the composite sketch into evidence. Johnson, who was killed in an unrelated shooting soon after Harris's murder, did not testify. The first jury hung. The second jury convicted. After Taylor apparently recanted, Woods exhausted state postconviction remedies and filed a petition for a writ of habeas corpus in federal district court, alleging that the State's use of the police sketch violated his rights under the Sixth

Amendment's Confrontation Clause, and that the prosecutor failed to disclose exculpatory evidence. The district court denied Woods's petition. Because the standard that governs our review mandates substantial deference to state-court decisions, we affirm.

I

A

Eric Harris, the victim whose death gave rise to this case, rented and operated the "Green House," a two-story green-painted "dope house" in southwest Detroit. Harris, who sold crack cocaine for a living, used the Green House to conduct his business and also rented rooms to drug users. The home was managed by Gloria Patton, the mother of Harris's girlfriend.

In January 2003, Harris apparently exchanged some words with Donyelle Woods, who also sold drugs, over the men's respective drug territories. But apart from that January encounter and an unsubstantiated rumor that Harris had "arguments with" Woods, there is no evidence that Woods had a relationship with Harris, and Woods remained largely unknown to those who frequented the Green House.

On May 7, 2003, Harris's girlfriend, Tomeka Shaw, spotted Harris walking around the neighborhood accompanied by an unknown man, later identified as Chavez Johnson, who was dressed in a white jogging suit and a red cap. Shaw, who was driving on her way to pick her children up from school, did not stop. Later that evening, Gloria Patton saw Harris return to the Green House with Johnson, whom Harris was urgently asking, "What you going to do dog, what you going to do[?]" A little while later, Darnell Hunter, another local drug dealer, walked into the Green House with a man called "Big Dog." Both men found Harris, and a heated argument about money ensued. According to Patton's trial testimony, Harris became agitated, and once the men left, Harris told Patton to "get everybody out [of] the house" because "I [am] going to

2

burn this m[——]f[——] down." Patton recalled Harris frantically exclaiming, "If I ain't going to have this house, nobody [is] going to have it."

Meanwhile, Sandra Taylor, a Green House regular who suffered from a crack-cocaine addiction, paged Harris in order to arrange to pay him for some drugs she had taken on credit earlier that day. Shortly before 1:00 am on Thursday, May 8, 2003, after receiving Taylor's page, as well as another page from an unknown person, Harris left the Green House with Chavez Johnson to walk to a nearby Marathon gas station, presumably to meet Taylor. Harris arrived at the gas station before Taylor did and called his girlfriend, Tomeka Shaw.

While Harris was on the phone with Shaw, a man walked up to him and brandished a gun. Harris saw the man and exclaimed to Shaw, as she later testified, that "this whore ass n[——] got a gun on me[,] but that's all right, here go the police." The assailant fired seven bullets at Harris, five of which struck him. According to two eyewitnesses, the assailant then jumped into a blue or gray or brown Toyota sedan driven by a woman, who quickly accelerated the vehicle out of the gas station. Johnson dashed across the street and ducked behind a nearby church. After disappearing for a few minutes, he made his way back to the Marathon station.

Officers of the Detroit Police Department ("DPD") soon arrived on the scene, where they found Harris's body by the pay phone. DPD Officer Michael Carlisle, who headed the initial investigation into Harris's death, ordered officers to detain Johnson and swab him for gunshot residue. Officers took Johnson to a nearby police station, where he was swabbed and questioned. But DPD could not find any weapons in the area around the Marathon station, and interviews with Johnson failed to turn up any evidence that he was involved. Officers released Johnson from custody late on Thursday morning. Upon his release, Johnson, who at the time was the only witness who claimed to have seen Harris's killer, agreed to speak with a DPD sketch artist

to provide a description of the assailant. But because no artist was available on Thursday, Officer Carlisle scheduled the interview for the following Monday.

After speaking with Gloria Patton and David Jennings, who also witnessed the argument between Harris, Hunter, and "Big Dog," Carlisle began to suspect that Hunter, who was known on the street by the name "T," was responsible for Harris's death. Moreover, DPD officers familiar with the neighborhood knew that Hunter frequented the area around the Marathon station, and officers found a gray Toyota sedan parked outside of a house where they thought that Hunter lived. But after officers interviewed Hunter and executed a search warrant at the house, which turned out to have no relation to Hunter or the crime, Officer Carlisle ruled him out as a suspect. A couple of weeks later, Johnson, who had been "very cooperative" with Carlisle's investigation, was killed in an unrelated shooting. Aside from Johnson's sketch, Carlisle was left without any promising leads.

Carlisle then received an anonymous tip that Sandra Taylor had also witnessed the shooting. Carlisle tracked Taylor down at a Detroit halfway house and visited her in an effort to gain more information about the case. Though Taylor confirmed that she had witnessed the shooting, she declined to give Carlisle a formal statement out of fear for her safety. During a subsequent interview in September 2003, more than five months after the shooting, Taylor stated that a man named "Ferdinand" had shot Harris.

At around that time, Carlisle was transferred to a cold-case squad, and DPD Officer Charles Zwicker took charge of the investigation into Harris's murder. From speaking with officers familiar with the area around the Green House, Officer Zwicker learned that Woods went by the name "Ferdinand" in the neighborhood. On September 29, Zwicker tracked down a photograph of Woods and showed it to Taylor. Taylor confirmed that "that's the man that shot

Eric Lee Harris," and signed a written statement implicating Woods. Woods was arrested six hours later.

B

The State of Michigan charged Woods with first-degree murder, possession of a firearm during a felony, and possession of a weapon by a felon. The court subsequently dismissed the third count and scheduled a trial in Woods's case for January 2004. After two days of hearing evidence, including Woods's girlfriend's testimony that Woods was at home at the time of Harris's shooting, the jury deadlocked. The court scheduled another trial for March 2004.

At the second trial, the State called several witnesses, among them Tomeka Shaw, Gloria Patton, and David Jennings, who provided information about Harris's whereabouts during the day leading up to the killing, and about his altercation with Darnell Hunter and "Big Dog" at the Green House. The State also called Maurice Harris, supposedly the victim's cousin and fellow drug dealer, who testified about Woods's January 2003 disagreement with Harris over drug territory. Officers Carlisle and Zwicker recounted DPD's investigation of Harris's murder, including the fact that the sketch artist interviewed Chavez Johnson. Carlisle indicated that Johnson's murder, in which the prosecutor strongly, and inaccurately, implied Woods was involved, remained unsolved. William Steiner, who worked in DPD's crime lab, testified that he had recently conducted the gunshot-residue analysis on Johnson's samples, which revealed some gunshot residue on Johnson's right hand but not on his left hand or forehead. Steiner testified that the residue was consistent with Johnson's having fired a weapon, but that the residue could also have accumulated on Johnson's hand if he had been standing in close proximity at the time of the shooting or had handled a firearm that had recently been discharged. Patrick Gray, a truck driver who had been completing daily logs in his truck near the Marathon station when Harris

5

was killed, also took the stand and explained that he heard gunshots, saw a blue or gray Toyota "hightailing it" out of the station, and saw Johnson running down the street.

Finally, the State also called Sandra Taylor, the only living witness to actually connect Woods to the scene of Harris's murder. Taylor testified that she arrived at the Marathon station and watched as Harris talked on the pay phone while standing next to Johnson. She stated that a gray or brown vehicle soon pulled up, and Woods, whom Taylor recognized from a prior drug purchase, got out of the vehicle. Without saying a word, Woods allegedly fired a weapon several times at Harris, killing him. Taylor then saw Woods jump back into the car, which sped away.

Taylor's trial testimony was inconsistent in some respects with previous sworn statements that she had given and with other testimony at trial. Taylor had testified in a pretrial examination that Harris was alone at the gas station and that Woods spoke to Harris before shooting at him. But at Woods's second trial, Taylor stated that Harris was with Johnson, not alone, and that Woods never said anything to Harris. And while Gray and Officer Carlisle confirmed that Johnson was wearing a red hat, Taylor testified that Johnson was not wearing anything on his head. On top of these contradictions, Taylor also admitted that she was "high as hell" during the entire incident.

To bolster Taylor's somewhat inconsistent testimony, the State introduced the DPD sketch made from Johnson's interview and referred to it during opening and closing arguments. During her opening argument, the prosecutor told the jury that Johnson "le[ft] behind a face, an image that he created working with a DPD sketch artist of the person who committed this offense. . . . You make up your own mind whether or not that sketch is that of this defendant sitting there." At closing, the prosecutor instructed the jury to "look at this sketch and . . . decide whether or not[,] in addition to the testimony of Sandra Taylor, another eye-witness picked out

6

this defendant as being the shooter." The prosecutor went on, "[H]e's speaking to you, telling you who, in fact, committed this crime," and asked the jurors, "isn't it a coincidence . . . that Chavez Johnson, a witness to this homicide, is killed three weeks later?"

Although Woods planned to present the testimony of a woman named Shaye Taylor, who—according to a police report taken after the shooting—would have testified that she saw Chavez Johnson shoot Harris, Shaye Taylor ignored a subpoena and did not appear in court. Woods did not call any other witnesses in his defense. The jury convicted after deliberating for approximately three-and-a-half hours. The court sentenced Woods to a mandatory term of life imprisonment without the possibility of parole on the murder charge, and two years in prison on the firearm charge.

## C

On direct appeal, the Michigan Court of Appeals rejected a jury-instruction claim and several claims of ineffective assistance of trial counsel and affirmed Woods's conviction. The Michigan Supreme Court denied leave to appeal. Woods then filed a motion for relief from judgment in the state trial court, arguing that the admission of the sketch produced from DPD's interview with Chavez Johnson had violated his Sixth Amendment right to confront adverse witnesses. The state trial court rejected the claim on its merits. The court relied on the Supreme Court's then-recent decision in *Davis v. Washington*, 547 U.S. 813 (2006), in which the Court defined and distinguished "testimonial statements" of an unavailable witness, the introduction of which the Confrontation Clause prohibits, from "nontestimonial statements," which the Confrontation Clause allows. *Id.* at 821–22. The *Davis* Court explained:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such

ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822. Applying this distinction to the facts before it, the state trial court held that Johnson's statements, which resulted in the DPD sketch, were nontestimonial in nature:

> In this case, as in *Davis*, the sketch, objectively considered, was to help capture the person who gunned down the victim and the sketch was necessary to resolve the present emergency, rather than learn what had happened in the past to establish evidence of a crime. . . . Moreover, the circumstances of the drawing of the sketch "objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency."

For these reasons, the court concluded that Woods's Confrontation Clause claim lacked merit and denied his motion.

The Michigan Court of Appeals and Michigan Supreme Court denied Woods leave to appeal, citing Michigan Court Rule 6.508(D). Rule 6.508(D) limits a Michigan court's authority to grant relief from judgment and, among other restrictions, provides that unless a litigant can show cause and prejudice, Michigan courts may not entertain any nonjurisdictional postjudgment claim that could have been raised on direct appeal or in a prior postjudgment motion. Mich. Ct. R. 6.508(D)(3). The state trial court denied Woods's second and third state postconviction motions as well, citing Michigan Court Rule 6.502(G), which prohibits successive postconviction motions except where premised on a "retroactive change in law that occurred after the first motion for relief from judgment or a claim of new evidence that was not discovered before the first such motion." Mich. Ct. R. 6.502(G)(2). The Michigan Court of Appeals and Michigan Supreme Court again denied leave to appeal in both instances.

In January 2010, Woods received several documents from DPD through a request under Michigan's freedom-of-information law. Among those items were Officer Zwicker's previously undisclosed case notes, in which Zwicker opined that Harris's shooter was likely one of the two

men who argued with Harris at the Green House on the night that Harris was killed. The items also included a report from a DPD officer to Officer Carlisle, in which the authoring officer recounted that Eric Harris, the victim, had been having "major problems" with his girlfriend, Tomeka Shaw. The body of the report stated in full:

> Sister stated [victim] was having major problems with Tameka. Eric had move[d] back to Miss[issippi] on March 20, 2003[.] He came back to Detroit Ap[r]il 7, 2003. When he came back Tameka had another man staying at the house. Tameka would constantly accuse Eric of cheating on her. She was trying to sell Eric's cars while he was in Miss[issippi]. He told Tameka he was going to leave her. He called sister 12 hours before his death and told her he was coming and leaving Tameka that day. Tameka had stabbed Eric in neck area on April 28, 29 or 30th. Eric said Tameka called the police on him that night.

Woods's postconviction counsel also uncovered additional evidence of discord between Harris and Shaw. In particular, in 2010, Harris's brother Clarence Booker gave Woods's postconviction counsel an affidavit in which Booker stated that in the weeks before Harris's murder, Harris had told Booker that he planned to leave Shaw because of constant feuding, and that a day before the murder, Shaw had slashed the tires on Harris's car and smashed the windows. Morris Mills, with whom Shaw had apparently been having an affair at the time of Harris's murder, also gave a written statement to Woods in which he stated that Shaw "told me that she and her two partner's [sic] 'T' & 'Dog' in the drug business with her hired a hit man to kill her late husband because of money he owed to her (Tamika) and the partner's [sic] 'T' & 'Dog.'" According to Mills, Shaw "told 'T' and 'Dog' to hire the killer and that . . . she would set [the murder] up at a pay phone where she and [Harris] always got in touch with each other when [e]n route to different places. She said that she paged Eric [Harris] and knew that he would be there to get killed that day."

Woods's postconviction counsel also learned that by the time of Woods's trial, Officer Carlisle believed that there was no connection between Harris's murder and Chavez Johnson's

9

subsequent death, and that Taylor had an outstanding Tennessee warrant when she testified against Woods in 2004. Additionally, in 2009, Taylor, who was by then incarcerated in Tennessee, told a Nashville lawyer, who interviewed her on behalf of Woods's postconviction counsel, and who later testified to the conversation in a 2011 state-court evidentiary hearing, that she was not at the scene of the murder, had lied during Woods's two trials, and had heard that Shaw had "put a hit out on" Harris. The attorney further testified that Taylor stated that she gave false testimony at Woods's trials because DPD officers promised not to take any action on her outstanding warrant if she cooperated.

On the basis of Taylor's outstanding warrant, Officer Carlisle's belief that the Harris and Johnson murders were unrelated, Officer Zwicker's case notes, and the DPD officer's report detailing Shaw's problems with Harris, Woods filed a fourth motion for relief from judgment in state court, in which he alleged that the prosecutor should have turned over all of this evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), which requires a new trial if the government suppressed evidence that is both favorable and material, *see Kyles v. Whitley*, 514 U.S. 419, 421–22 (1995). Woods also claimed that the newly discovered evidence of Taylor's recantation warranted a new trial under state law.

On May 12, 2011, the state trial court held an evidentiary hearing on Woods's motion. Woods called his trial counsel, Burke Keaty (the Nashville lawyer who interviewed Taylor), and Officer Carlisle. Taylor, who could not be located after she left prison in 2010, did not appear.

Woods's trial counsel testified that Woods had steadfastly maintained his innocence. She explained that the withheld evidence that postconviction counsel discovered would have been useful in impeaching Taylor, investigating Shaw's involvement in the crime, and negating the prosecutor's intimation that Woods had killed Johnson in order to make him unavailable for trial.

10

Keaty testified that Taylor recanted and stated that she lied about Woods's involvement in the crime, which she told Keaty she never actually witnessed. According to Keaty, Taylor stated that she had actually been at the Green House in the early morning of May 8, 2003, until somebody came in and "told everyone there that [Harris] had been" shot. Taylor also told Keaty that Officer Carlisle approached her after the shooting and showed her a picture of Woods, but that she told Carlisle that she did not know that Woods had been involved in a killing. Taylor then told Keaty that she ultimately agreed to testify against Woods when DPD officers promised to "help her out with" some open warrants and that once she agreed, a man, presumably Officer Carlisle, gave her $1,000 in cash for her help with solving Harris's murder.

Officer Carlisle testified that by the time of Woods's trial, he had "concluded" that Johnson's death was unrelated to Harris's. Carlisle also recounted that during his first meeting with Taylor in 2003, Taylor was "very open" with him and explained her "[eye]-witness account of this murder." Carlisle denied that he ever threatened Taylor, that he bribed her to testify, or that he indicated to her that he knew she had any open warrants. Carlisle also testified that he did not recall hearing Taylor say that she did not witness Harris's murder.

After considering the documentary and oral evidence, the trial court denied Woods's motion. The court ruled that Taylor's recantation was not "newly discovered" evidence—as it must have been in order to pass the threshold requirement for successive postconviction motions imposed by Michigan Court Rule 6.508(D)(3)—because it was discovered prior to the court's ruling on Woods's third state postconviction motion and should have been raised as a supplemental pleading to that motion instead of in a new motion. The court also held that Taylor's recantation "lack[ed] sufficient indicia of trustworthiness" because (1) Taylor did not testify at the evidentiary hearing, depriving the court of the opportunity to properly assess her

credibility; (2) Taylor demanded that Woods's postconviction counsel compensate her for the time she spent speaking with Keaty; and (3) Taylor's allegations, introduced as unsworn hearsay testimony, were inconsistent with Officer Carlisle's more reliable testimony. For these reasons, the court denied Woods's motion for a new trial on the basis of Taylor's recantation alone.

Turning to the four undisclosed pieces of evidence that formed the basis of Woods's *Brady* claims, the court held that none was newly discovered for purposes of Rules 6.508(D)(3) and 6.502(G)(2), and in any event did not need to be disclosed by the prosecution under *Brady*. The court explained that the prosecutor had not suppressed information about Taylor's open warrant or Officer Carlisle's opinion on the relationship between Harris's and Johnson's murders. The court also held that Woods failed to show that the DPD report or Officer Zwicker's notes were material because their probative value was slight. The court denied Woods's motion, and the Michigan Court of Appeals and Michigan Supreme Court denied leave to appeal, citing Michigan Court Rule 6.508(D).

D

While his third postconviction motion was pending in state court, Woods filed a petition for a writ of habeas corpus in federal district court in April 2009. Upon motion, the district court held the petition in abeyance pending the outcome of Woods's state postconviction motions. Once the Michigan Supreme Court denied Woods's motion for reconsideration from the court's denial of his fourth state postconviction motion, Woods filed an amended habeas petition, in which he alleged that the use of the police sketch violated his Confrontation Clause rights and that the State's failure to disclose Taylor's outstanding Tennessee warrant, Officer Carlisle's conclusion that there was no connection between the Harris and Johnson murders, Officer

Zwicker's case notes, and the DPD report describing Shaw's history of violence against Harris amounted to violations of his Fourteenth Amendment due-process rights under *Brady*.

The district court denied Woods's petition. The court explained that Woods's Confrontation Clause claim was not procedurally defaulted but held that the state court's adjudication of the claim did not result in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The district court declined to decide whether Woods's *Brady* claims were procedurally defaulted, and instead rejected them on the merits because the new evidence was either not suppressed or did not meet *Brady*'s materiality requirement. This appeal followed.

II

Our review of this case is subject to the restrictions imposed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. Animated by the principles of "comity, finality, and federalism," *Williams v. Taylor*, 529 U.S. 420, 436 (2000), AEDPA "sharply limits the circumstances in which a federal court may issue a writ of habeas corpus to a state prisoner whose claim was 'adjudicated on the merits in State court proceedings,'" *Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013) (quoting 28 U.S.C. § 2254(d)). When a state prisoner's claim has been "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d), a federal court may not disturb the state-court judgment unless the prisoner can show that either of two conditions are met.

First, a federal court may grant a prisoner habeas relief if the state court's merits adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." *Id.* § 2254(d)(1).

13

A state-court decision is "contrary to" federal law only if the "state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 n.2 (2013) (quoting *Williams*, 529 U.S. at 413). A state court's decision involves an "unreasonable application of" federal law if the "state-court decision 'identifies the correct governing legal principle' in existence at the time," but "unreasonably applies that principle to the facts of the prisoner's case." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (quoting *Williams*, 529 U.S. at 413).

Second, federal habeas relief may be warranted where the state-court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). To prove that a state court's factual assessment was "unreasonable," a petitioner must show that "a reasonable factfinder must" disagree with the state court's assessment. *Rice v. Collins*, 546 U.S. 333, 341 (2006).

As the Supreme Court has repeatedly made clear, *see, e.g.*, *Woods v. Etherton*, 136 S. Ct. 1149, 1152–53 (2016) (per curiam); *White v. Wheeler*, 136 S. Ct. 456, 461 (2015) (per curiam); *Woods v. Donald*, 135 S. Ct. 1372, 1377–78 (2015) (per curiam); *Parker v. Matthews*, 132 S. Ct. 2148, 2149, 2151–53 (2012) (per curiam), these two provisions set forth a "highly deferential" standard for reviewing state-court rulings, *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997). To prevail, a petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

14

On appeal, we review de novo the district court's legal conclusions and mixed questions of law and fact, including whether the state court's adjudication was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Moore v. Mitchell*, 708 F.3d 760, 774 (6th Cir. 2013). Although this court ordinarily reviews the district court's findings of fact for clear error, *ibid.*, it must give de novo review to any such findings that are based on a review of state-court records, *Boggs v. Collins*, 226 F.3d 728, 736 (6th Cir. 2000). With this standard of review in mind, we turn to the constitutional claims that Woods raises on appeal.

## III

We start with Woods's contention that the state court unreasonably applied clearly established Supreme Court law when it denied his Confrontation Clause claim. Before we reach the merits of that claim, however, we must address the Warden's argument that Woods procedurally defaulted it by failing to comply with state procedural rules. As we explain, although Woods did not procedurally default his Confrontation Clause claim, the state court's adjudication of that claim did not result in a decision that was erroneous under AEDPA's deferential standard.

## A

A four-part test determines whether a claim has been procedurally defaulted in state court. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). First, there must be a state procedural rule applicable to the petitioner's claim, and the petitioner must have failed to comply with that rule. *Ibid.* Second, the state court must actually have invoked the rule, using it as a basis for declining to grant relief from the judgment. *Ibid.* Third, the procedural rule must be an independent and adequate ground on which the state can rely to foreclose review of a federal claim. *Ibid.* Fourth, even if all of the three preceding conditions are met, we may nonetheless

15

consider a defaulted claim if the petitioner shows cause for the default and resulting prejudice, or if he shows that our failure to review the claim would result in a miscarriage of justice. *Ibid.* The Warden bears the burden of proving the first three requirements, *see Mitchell v. Mason*, 325 F.3d 732, 739 (6th Cir. 2003), and in this case he cannot show that the state court actually relied upon a procedural rule that would prohibit federal consideration of Woods's Confrontation Clause claim.

Woods brought his Confrontation Clause claim in his first motion for relief from judgment, which was subject to the requirements of Michigan Court Rule 6.508(D). As mentioned above, paragraph (D)(3) of that rule provides that, unless a movant shows cause and prejudice, Michigan courts may not grant the movant relief on any nonjurisdictional ground that "could have been raised on appeal from the conviction and sentence or in a prior motion" for relief from judgment. Mich. Ct. R. 6.508(D)(3). Although we have recognized paragraph (D)(3) as an independent and adequate ground on which a state court may rest its decision, *see Alexander v. Smith*, 311 F. App'x 875, 882 (6th Cir. 2009) (per curiam), another part of Rule 6.508(D) permits state courts to deny relief for the non-procedural, merits-based reason that the defendant did not carry his "burden of establishing entitlement to the relief requested," Mich. Ct. R. 6.508(D); *see Guilmette v. Howes*, 624 F.3d 286, 290–91 (6th Cir. 2010) (en banc). For this reason, a Michigan court's summary order that simply cites to Rule 6.508(D) without elaboration is ambiguous, and this court must "look [through that unexplained order] to the last reasoned state court opinion to determine the basis for the state court's rejection" of the petitioner's claim. *Guilmette*, 624 F.3d at 291; *see also Ylst v. Nunnemaker*, 501 U.S. 797, 801, 803–04 (1991).

In this case, the last state court to rule on Woods's Confrontation Clause claim was the Michigan Supreme Court, which denied Woods's application for leave to appeal because Woods

"failed to meet the burden of establishing entitlement to relief under [Michigan Court Rule] 6.508(D)." Because this order does not clarify whether Woods's claim failed for procedural or merits-based reasons, the order is unexplained. *See Guilmette*, 624 F.3d at 291. The same is true of the Michigan Court of Appeals's opinion, which made the same cryptic reference to Rule 6.508(D). Thus, the last reasoned state-court opinion to address Woods's Confrontation Clause claim is the state trial court's denial of Woods's first postconviction petition. In that opinion, the court squarely addressed the merits of Woods's Confrontation Clause claim without any reference to Rule 6.508(D) at all.

The Warden counters that toward the end of its opinion, "the [state] trial court specifically cited Mich. Ct. R. 6.508(D)(3) and said that it found no good cause to excuse Woods'[s] failure to previously raise 'all of the aforementioned claims,'" which, according to the Warden, obviously "included [the] confrontation claim" that the court had already discussed. Appellee Br. 16. It is true that "[a]n alternative holding in which a state procedural bar is a sufficient basis for the state court's judgment is adequate to preclude a claim from being raised on habeas review, even when the state court also relies on federal law." *Simpson v. Jones*, 238 F.3d 399, 408–09 (6th Cir. 2000). But it is also true that "[t]o operate as a bar to habeas review, [a state procedural] rule *must be clearly and expressly invoked*." *Henderson v. Palmer*, 730 F.3d 554, 561 (6th Cir. 2013) (quoting *Skinner v. McLemore*, 425 F. App'x 491, 495 (6th Cir. 2011) (emphasis added)). Otherwise put, "there must be *unambiguous* state-court reliance on a procedural default to block" federal review. *Ibid.* (emphasis added) (quoting *Skinner*, 425 F. App'x at 495).

In this case, it is far from clear the state trial court applied Rule 6.508(D)(3) to Woods's Confrontation Clause claim. After addressing the merits of that claim, the state court moved on

17

to Woods's other claims, including "arguments [that] his conviction was against the great weight of the evidence, he was denied a fair trial when the prosecution bolstered its star witness[,] and [was denied a fair trial] due to the cumulative effect of numerous constitutional errors."  The court continued that it "finds no good cause to all of the aforementioned claims," and then explained Rule 6.508(D)(3).  Context strongly suggests that the court mentioned and enforced this procedural bar with respect to the "aforementioned" three claims—that Woods's conviction was against the great weight of evidence and that he was denied a fair trial for two reasons—not all of the "aforementioned" claims that the court previously addressed in its opinion.  For this reason, although Rule 6.508(D)(3) is a consistently applied procedural bar capable of prohibiting federal review, the state trial court did not "clearly and expressly" invoke that rule with respect to Woods's Confrontation Clause claim.  That claim is thus not procedurally defaulted, and nothing prevents us from addressing it here.

B

Although we may consider Woods's Confrontation Clause claim, we may not do so de novo.  Rather, because the state court reached the merits of the claim, our review is subject to the restrictions imposed by 28 U.S.C. § 2254(d).  *See Fleming v. Metrish*, 556 F.3d 520, 530 (6th Cir. 2009) ("[T]he question of whether a claim should be addressed on collateral review under the judicially created doctrine of procedural default is independent of the question of whether Congress requires deference pursuant to AEDPA."); *Brooks v. Bagley*, 513 F.3d 618, 624–25 (6th Cir. 2008) (explaining that "an alternative procedural-bar ruling does not alter the applicability of AEDPA").

Woods's claim is that the introduction of the police sketch made from Chavez Johnson's interrogation violated his rights under the Sixth Amendment's Confrontation Clause, which

18

provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." This procedural guarantee applies with equal force to state criminal prosecutions. *See Pointer v. Texas*, 380 U.S. 400, 403–05 (1965). In *Crawford v. Washington*, 541 U.S. 36 (2004), which "initiated a sea change in Confrontation Clause jurisprudence," *McCarley v. Kelly*, 801 F.3d 652, 662 (6th Cir. 2015), the Supreme Court held that the Confrontation Clause prohibits the admission of "testimonial" hearsay against a criminal defendant unless the witness is unavailable and the defendant had a prior opportunity to cross-examine him, *Crawford*, 541 U.S. at 68. "[N]ontestimonial hearsay," on the other hand, is "exempted . . . from Confrontation Clause scrutiny altogether." *Ibid.*

The Supreme Court explained what it meant by "testimonial hearsay" in *Davis*. The *Davis* Court, which also adjudicated a companion case captioned *Hammon v. Indiana*, 547 U.S. 813 (2006), confronted two sets of facts. In *Davis*, a woman named Michelle McCottry called the police and told the emergency operator that her boyfriend was attacking her. *Id.* at 817–18. The operator asked McCottry several questions, and the prosecution used McCottry's answers against her boyfriend at a subsequent trial. *Id.* at 818–19. In *Hammon*, police responded to reports of a domestic disturbance at a residence to find Amy Hammon on her porch and her husband inside the house. *Id.* at 819. Hammon "appear[ed] 'somewhat frightened' but she told [the officers] that 'nothing was the matter.'" *Ibid.* Officers then entered the house with Hammon's permission, saw evidence of a fight, and interviewed her about what had occurred. *Id.* at 819–20. The State subsequently used Hammon's testimony in a domestic-violence prosecution against her husband. *Id.* at 820.

19

On direct review, the Supreme Court held that whereas McCottry's statements were not testimonial, and therefore admissible against her boyfriend, Hammon's were testimonial, and therefore inadmissible against her husband. As mentioned above, the Court explained:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822.

McCottry's statements, which described events as they were happening, were obviously necessary to resolve an immediate threat to her safety and were the product of relatively informal questioning, and hence were not testimonial because these circumstances "objectively indicate [that] [McCottry's interrogation's] primary purpose was to enable police assistance to meet an ongoing emergency." *Id.* at 828. Hammon's statements, by contrast, were the product of an "investigation into possibly criminal *past* conduct," there was "no emergency in progress" or any "immediate threat," and the interview, which police conducted after taking Hammon to a separate room, was somewhat more formal. *Id.* at 829–30 (emphasis added). These circumstances led the Court to conclude that "the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime," and Hammon's responses were therefore testimonial. *Id.* at 830.

Applying this framework to the facts of this case, there are serious doubts about whether the state trial court placed Woods's claim on the right side of the testimonial/nontestimonial divide. Just as the officers in *Hammon*, the DPD sketch artist asked Johnson about a crime that had already occurred, rather than a crime that was in progress. *Ibid.* Johnson's conversation

20

with police, which occurred at a DPD station, took place in a far more formal setting than the "formal enough" interview in *Hammon*, which took place in the victim's living room. *Ibid.*

Perhaps most importantly, the time that elapsed between the shooting and Johnson's interview—four full days—was far more than the mere minutes that transpired between the fight and McCottry's statements to the emergency dispatcher. *Id.* at 817–18. This lapse of time is quite significant. As the author of *Crawford* and *Davis* has observed, "[m]any individuals who testify against a defendant at trial first offer their accounts to police in the hours after a violent act. If the police can plausibly claim that a 'potential threat to . . . the public' persisted through those first few hours," then "a defendant will have no constitutionally protected right to exclude the uncross-examined testimony of such witnesses." *Michigan v. Bryant*, 562 U.S. 344, 388–89 (2011) (Scalia, J., dissenting) (alteration in original) (quoting *id.* at 359 (majority opinion)). That concern is far more pronounced when the lapse of time is measured not in hours but in days.

But this case is not before us on direct appeal. Because the state court adjudicated Woods's Confrontation Clause claim on the merits, we may not disturb its ruling unless "there could be no reasonable dispute that [it was] wrong." *Donald*, 135 S. Ct. at 1376. Moreover, where, as here, we apply AEDPA to a prisoner's claim that a state court unreasonably applied clearly established law, "our task is to 'determine what arguments or theories supported' the state-court decision or '*could have supported*' it; and then to determine whether 'fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of' the Supreme Court." *Davis v. Carpenter*, 798 F.3d 468, 475 (6th Cir. 2015) (quoting *Richter*, 562 U.S. at 102 (emphasis added)). Though we are well aware of the need for some temporal limit beyond which *Davis*'s exception for "nontestimonial hearsay" does not

ordinarily extend, we are equally convinced there is room for reasonable agreement with the state trial court's decision on the facts of this case.

We are guided by the reality that the state court is "entitled to special 'leeway'" in applying *Crawford* and *Davis* because "it was applying a rule that was neither fully defined in its meaning nor exhaustive in its scope." *Linton v. Saba*, 812 F.3d 112, 126 (1st Cir. 2016) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Davis*, 547 U.S. at 822 (refraining from making an "exhaustive classification" of testimonial statements); *Crawford*, 541 U.S. at 68 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'"). Indeed, the Supreme Court has more recently cautioned that under *Davis*, "the existence *vel non* of an ongoing emergency is [not] dispositive of the testimonial inquiry." *Bryant*, 562 U.S. at 366. Moreover, the Supreme Court has never defined the scope or weight of the "ongoing emergency" factor mentioned in *Davis*, which the Court decided during the same year that the Michigan trial court decided Woods's Confrontation Clause claim. Nor has the Court ever held that the threat posed by an at-large killer is not an ongoing emergency. *See id.* at 363.

Not until 2011, years after the state trial court adjudicated Woods's Confrontation Clause claim, did the Supreme Court first apply *Davis* to a situation in which the general public was arguably in danger because an armed shooter was at large. *See id.* at 359, 373. When it finally did so, the Court emphasized that assailants with firearms pose a far greater threat to public safety than do assailants like those in *Davis* and *Hammon*, who used their fists. *See id.* at 364 (faulting a lower court for "rel[ying] on *Davis* and *Hammon*, in which the assailants used their fists, as controlling the scope of the emergency" in a case that "involved the use of a gun"). Because Harris's killer was unknown, on the loose, and obviously capable of vicious acts of violence, there are material differences between the circumstances surrounding Johnson's

interview and those surrounding the interview in *Hammon*, where the police knew the identity of the unarmed assailant, the danger that the assailant posed to the general public was not great, and whatever threat once existed had subsided. *Davis*, 547 U.S. at 819–20.

We emphasize that in most cases, as the criminal event that gives rise to an emergency situation recedes into the past, it will surely become less and less likely that the "primary purpose" of an interrogation is to enable police to meet an "ongoing emergency." But as a habeas court, it is not our role to define and enforce a temporal limit to the exception for nontestimonial hearsay outlined in *Davis*. *See Pinholster*, 563 U.S. at 202 ("We have said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" (quoting *Richter*, 562 U.S. at 101)). It is sufficient that with little direction from the Supreme Court, and with facts that differ from those in *Hammon* in many important respects, a fairminded jurist could reasonably conclude that a four-day lapse of time was not long enough to shift the "primary purpose" of DPD's interview with Johnson away from responding to an "ongoing emergency." *Cf. Colon v. Taskey*, 414 F. App'x 735, 738–39 (6th Cir. 2010). Whatever our concerns about the implications of the state trial court's decision may be, because AEDPA requires us to refrain from disturbing state-court decisions that are not "so lacking in justification that there was an error well understood" and "beyond any possibility for fairminded disagreement," *Richter*, 562 U.S. at 103, Woods is not entitled to habeas relief with respect to his Confrontation Clause claim.

IV

Woods also argues that the State deprived him of due process of law by failing to disclose four items of exculpatory evidence, in violation of *Brady*. In particular, Woods complains that Taylor's outstanding Tennessee arrest warrant, Officer Carlisle's "conclusion" that Harris's and

23

Johnson's murders were not related, Officer Zwicker's case notes, and the DPD report about Harris's trouble with Shaw were all favorable, material evidence that the prosecutor had an obligation to disclose. Just as with Woods's Confrontation Clause claim, the Warden argues that Woods is not entitled to the writ because his *Brady* claims are either procedurally defaulted or without merit. Although the question of procedural default is not necessarily dispositive with respect to Woods's *Brady* claims, we agree with the Warden that Woods is not entitled to relief.

A

As mentioned above, we may not ordinarily review a federal constitutional claim that a state prisoner has procedurally defaulted unless the prisoner can show cause for his default and resulting prejudice. *See Maupin*, 785 F.2d at 138. As with Woods's Confrontation Clause claims, the Michigan Supreme Court and the Michigan Court of Appeals relied on Michigan Court Rule 6.508(D) in denying Woods leave to appeal from the trial court's denial of his four *Brady* claims. As before, because these summary citations to Rule 6.508(D) say nothing about whether the state appellate courts' denials rested on procedural or merits-based grounds, we must "look through" these appellate orders and determine whether the state trial court, which issued the last reasoned opinion on Woods's *Brady* claims, relied on a state procedural bar. *Nunnemaker*, 501 U.S. at 806; *see Guilmette*, 624 F.3d at 291. In this case, the state trial court addressed the merits of Woods's *Brady* claims and also relied on two procedural bars, namely, Rule 6.508(D)(3) and Michigan Court Rule 6.502(G)(2).

In considering whether to give preclusive effect to a procedural default, "this court must consider whether the petitioner actually failed to comply with a state procedural rule," *Hodge v. Haeberlin*, 579 F.3d 627, 642 (6th Cir. 2009), and in this case the parties dispute whether the state court properly applied Rules 6.508(D)(3) and 6.502(G)(2). As mentioned above, both of

24

those rules effectively prohibit prisoners from bringing successive motions for relief from judgment absent a retroactive change in the law or "new evidence." Mich. Ct. R. 6.502(G)(2); *see also* Mich. Ct. R. 6508(D)(3). Woods argues that he satisfied the requirements of the two rules because his claims rely on newly discovered evidence that the State suppressed. Appellant Br. 36–37, 43, 50, 54–55. The Warden, on the other hand, argues that the state trial court properly determined that a petitioner seeking relief under Rule 6.508(D)(3) and 6.502(G)(2) must not only show newly discovered evidence, but also that he could not have obtained the information contained in the evidence with reasonable diligence by the time of direct appeal or a previous postjudgment motion. Appellee Br. 39–40.

There is no need to resolve the question here. A prosecutor's suppression of *Brady* evidence constitutes cause under the procedural-default doctrine. *Brooks v. Tennessee*, 626 F.3d 878, 890–91 (6th Cir. 2010). Likewise, the "prejudice" requirement for procedural default requires the same analysis as the *Brady* "materiality" requirement. *Id.* at 891. "Thus, a petitioner who proves a *Brady* violation demonstrates cause and prejudice to excuse procedural default of the *Brady* claim." *Ibid.* The upshot is that whether or not the state court properly applied the state procedural bars, the result is the same.

If, for example, we assume that the state court did not properly apply Rules 6.508(D)(3) and 6.502(G)(2) to Woods's claims, we would review the *Brady* claims through AEDPA's deferential lens because the state trial court also addressed those claims on the merits. *See Brooks*, 513 F.3d at 624. If Woods could prevail under that standard, he would be entitled to relief only if he also proves an actual *Brady* violation on de novo review. *See Williams*, 529 U.S. at 406; *West v. Bell*, 550 F.3d 542, 553–54 (6th Cir. 2008). *See generally Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas

relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The same is true if we assume that the state trial court properly applied Rules 6.508(D)(3) and 6.502(G)(2). In that case, Woods can avoid the consequences of those procedural bars if he shows on de novo review that the prosecutor withheld material evidence, in violation of *Brady*. *See Jalowiec v. Bradshaw*, 657 F.3d 293, 305 (6th Cir. 2011); *Hall v. Vasbinder*, 563 F.3d 222, 236–37 (6th Cir. 2009) (explaining that claim of ineffective assistance of counsel used as "cause" to excuse the default of another claim is not reviewed under the deferential standard set forth in 28 U.S.C. § 2254(d)). If Woods also shows that the state court's adjudications of his *Brady* claims resulted in a decision that is inconsistent with clearly established federal law or one that was based on an "unreasonable determination" of the facts of his case, he would be entitled to habeas relief.

In sum, if Woods can prove a *Brady* violation to this court on de novo review and also show that the state court's adjudication "resulted in a decision" that does not satisfy the standard set forth in 28 U.S.C. § 2254(d), he would be entitled to habeas relief. If Woods cannot prove *both*, he is not entitled to relief, whether because he cannot show cause and prejudice to excuse his procedural default, or because he cannot succeed on the merits of his claims.

B

In criminal proceedings, the government has a constitutional duty to disclose certain evidence that is favorable to a defendant. *Brady*, 373 U.S. at 87. The state's suppression of any favorable evidence violates due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Ibid.* In order to comply with *Brady*, an "individual prosecutor has a duty to learn of any favorable evidence

26

known to the others acting on the government's behalf in th[e] case, including the police."

*Strickler v. Greene*, 527 U.S. 263, 281 (1999) (quoting *Kyles*, 514 U.S. at 437).

In order to prevail on a *Brady* claim, a criminal defendant must satisfy three requirements: The defendant must show (1) that the evidence in question is favorable; (2) that the evidence was suppressed by the prosecutor; and (3) that the evidence is material. *Id.* at 280–82. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (plurality opinion)). "A 'reasonable probability,'" in turn, "is a probability sufficient to undermine confidence in the outcome." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (quoting *Bagley*, 473 U.S. at 682 (plurality opinion)). The Supreme Court has emphasized that the materiality inquiry asks "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. Crucially, when a defendant alleges that the state has failed to disclose several pieces of *Brady* evidence, the materiality of that evidence is determined by examining the "*cumulative* effect of all such evidence suppressed," *id.* at 421 (emphasis added), not merely by examining the impact of each piece of evidence in isolation, *id.* at 440–41.

It appears that the state trial court ignored this last clearly established rule of law. As we discuss in greater detail below, whereas the state court held that the prosecutor had not suppressed Taylor's open warrant or Officer Carlisle's opinion about the Johnson murder, it did not explicitly decide whether Officer Zwicker's case notes or the DPD report about Shaw's history of violence with Harris were suppressed. Although the state trial court did hold that the notes and report were not "newly discovered" for purposes of Rule 6.502(G)(2) because, in the

27

court's view, Woods had already discovered most of the information that the notes and report ultimately revealed, the court never held that they were not suppressed under *Brady* for that same reason. Instead, the state court explained that even if Woods had met the requirements of Rule 6.502(G)(2), the prosecution was under no obligation to disclose the case notes or the DPD report because neither was material when considered alone.

Neither of the state court's individual materiality analyses is inconsistent with Supreme Court precedent. But instead of undertaking a cumulative analysis after analyzing the materiality of Zwicker's case notes and the DPD report in isolation, the state court simply concluded that Woods's *Brady* claims lacked merit and denied his postjudgment motion. In doing so, the state trial court ignored the Supreme Court's clear instruction that courts must assess the materiality of *Brady* claims cumulatively, not merely individually. *See Kyles*, 514 U.S. at 440–41; *see also Wearry v. Cain*, 136 S. Ct. 1002, 1007 (2016) (per curiam) ("[T]he state postconviction court improperly evaluated the materiality of each piece of evidence in isolation rather than cumulatively . . . ."). Because the "contrary to" clause applies when "the state court arrives at a conclusion opposite to that reached by th[e] [Supreme] Court on a question of law," *Williams*, 529 U.S. at 405, the state court's assumption that *Brady* requires only individual materiality assessments was "contrary to" clearly established federal law, *see Castleberry v. Brigano*, 349 F.3d 286, 291–92 (6th Cir. 2003).

C

Our observation that the state court's adjudication of Woods's *Brady* claims was "contrary to" clearly established federal law does not end our inquiry, but it does raise questions about whether and how "we may 'complete' the state court's reasoning." *Kubsch v. Neal*, 800 F.3d 783, 806 (7th Cir. 2015). Upon concluding that a state court's adjudication is "contrary

to" clearly established federal law, we ordinarily review a petitioner's constitutional claim de novo. *See Williams*, 529 U.S. at 405–06 (explaining that under the "contrary to" clause of 28 U.S.C. § 2254(d)(1), if a state court "applies a rule that contradicts the governing law set forth in" Supreme Court precedent, a federal habeas court "will be unconstrained by § 2254(d)(1) because the state-court decision falls within [that] clause"). Somewhat less clear is whether we may review the favorability, suppression, and materiality of all of Woods's *Brady* evidence de novo, or whether we must continue to defer to those parts of the state court's adjudication that are consistent with clearly established federal law and the record in this case.

AEDPA's text supplies part of the answer. AEDPA restricts federal habeas courts' review of "any *claim* that was adjudicated on the merits in State court." 28 U.S.C. § 2254(d) (emphasis added). A "claim" is any "asserted federal basis for relief from a state court's judgment of conviction." *Gonzales v. Crosby*, 545 U.S. 524, 530 (2005). Because even one item of favorable, suppressed, and material exculpatory evidence is by itself sufficient to warrant habeas relief under *Brady*, and because courts need not consider the materiality of any evidence that was not favorable or suppressed, a petitioner's *Brady* claim that is premised on unfavorable or nonsuppressed evidence is an independent "claim" that is no way affected by a state court's adjudication of other claims premised on other evidence. AEDPA thus demands that we apply 28 U.S.C. § 2254(d)'s deferential standard when reviewing the state trial court's denial of any of Woods's *Brady* claims on the ground that the relevant evidence was not favorable or was not suppressed. *Accord Monroe v. Angelone*, 323 F.3d 286, 298 & n.18 (4th Cir. 2003).

Whether, on de novo review of the cumulative materiality of evidence that is favorable and suppressed, AEDPA demands that we defer to the state court's assessments of the individual materiality of that evidence is a closer question on which other circuits have divided.

*Compare Simmons v. Beard*, 590 F.3d 223, 233–34, 237–38 (3d Cir. 2009), *with Barker v. Fleming*, 423 F.3d 1085, 1095–101 (9th Cir. 2005). Given that a court must assess the individual materiality of undisclosed evidence under *Brady* before considering its collective impact, *see Kyles*, 514 U.S. at 436 n.10, the state court's individual analyses would seem to remain highly relevant. *See Monroe*, 323 F.3d at 299 n.19. Ignoring them would not only subvert AEDPA's goal of advancing "comity, finality, and federalism," *Williams*, 529 U.S. at 436, but would also be inconsistent with the Supreme Court's recognition that the applicable "standard of review can change [even] for individual elements of [one] claim," *Brady v. Pfister*, 711 F.3d 818, 826 (7th Cir. 2013) (discussing *Wiggins v. Smith*, 539 U.S. 510 (2003), in which the Court applied AEDPA deference to performance element of petitioner's ineffective-assistance-of-counsel claim but reviewed prejudice element de novo).

Nonetheless, we need not conclusively resolve what deference, if any, we owe to the state court's individual materiality analyses in this case. Our de novo review of the import of Officer Zwicker's case notes and the DPD report about Shaw leads us to conclude that, individually or together, they do not undermine confidence in the outcome of Woods's trial. Because Woods's failure to succeed on de novo review precludes him from succeeding under the more deferential AEDPA standard, *see Holland v. Rivard*, 800 F.3d 224, 237 (6th Cir. 2015), we need not decide whether or how 28 U.S.C. § 2254(d) applies to our materiality analysis.

Accordingly, applying the standard set forth in 28 U.S.C. § 2254(d), we first review the state court's determinations of the favorability and suppression of each item of evidence that Woods claims the prosecutor should have turned over. *See Monroe*, 323 F.3d at 298 n.18. We then independently consider the materiality of any evidence that was both favorable and suppressed. Because "the only way to evaluate the cumulative effect is to first examine each

30

piece standing alone," *Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1310 (11th Cir. 2005), we review the materiality of this evidence in isolation before undertaking the collective analysis that the state court did not perform.

1

Woods's first claim—that the prosecution's failure to disclose that Taylor had an open Tennessee warrant amounted to a *Brady* violation—is not grounds for granting his petition. The state trial court rejected Woods's claim and cited three independent reasons for why the open warrant did not satisfy *Brady*'s suppression requirement, namely: (1) impeachment evidence does not require a new trial under *Brady*; (2) there was no evidence that the prosecutor or police ever possessed evidence of the open warrant; and (3) Woods failed to show that his trial counsel was unaware of the open warrant. The state trial court's first ground for rejecting Woods's claim is obviously "contrary to" the Supreme Court's unambiguous holding that "[i]mpeachment evidence . . . falls within the *Brady* rule." *Bagley*, 473 U.S. at 676. But the court's second finding was consistent with the record before it. Even assuming that the court's third rationale is, as Woods argues, based on an unreasonable assessment of the facts, we must thus accept the state court's second explanation for why the State did not suppress evidence of Taylor's outstanding warrant. *See Moody v. Polk*, 408 F.3d 141, 147 (4th Cir. 2005) ("An error in a state court's analysis does not render the state court's decision contrary to or an unreasonable application of Supreme Court precedent when that analysis is not necessary to the state court's resolution of the claim."); *accord Morris v. Carpenter*, 802 F.3d 825, 840–42 (6th Cir. 2015), *petition for cert. filed sub nom. Morris v. Westbrooks* (U.S. Apr. 19, 2016) (No. 15-9002).

To show that the state suppressed evidence, a petitioner must at the very least prove that the evidence was in the possession of the prosecutor or those working on her behalf. *See Strickler*, 527 U.S. at 280–82. Woods points out that at the state court's evidentiary hearing, Officer Carlisle testified that when investigating a crime, he would "typically" check to see whether a witness had any outstanding warrants in order to better evaluate the witness's credibility. But Officer Carlisle never stated that he actually did so with Taylor's criminal record. Even if Carlisle had run a background check on Taylor, it is not clear from the record whether such a check would have turned up Taylor's Tennessee warrant. Importantly, Woods has submitted no evidence showing that DPD actually had information about the warrant at the time of Woods's second trial.

Woods did submit evidence showing that in 2005, officers of the City of Taylor—a Michigan municipality—arrested Taylor and subsequently discovered that she had an outstanding warrant in Tennessee. But it is unclear how those officers acquired this information. Indeed, City of Taylor records note only that Taylor *volunteered* that she had an open warrant in Tennessee, and Woods's proof of Taylor's Tennessee warrant appears to have come from his postconviction counsel's check of a Tennessee-specific offender registry, not DPD's or the City of Taylor's own records. And although Burke Keaty, the Nashville attorney, testified that Taylor said that Carlisle threatened to arrest her on an open warrant if she did not incriminate Woods, the reliability of Taylor's testimony is, as the state court recognized, highly questionable given that it is hearsay communicated through Keaty and is also inconsistent with Carlisle's testimony on several important points.

To prove that a state court's factual determination was unreasonable, a petitioner has to show that "a reasonable factfinder must" disagree with the state court's assessment. *Collins*,

32

546 U.S. at 341. Though it is possible that DPD did in fact conduct a background check on Taylor at the time of its investigation into Harris's murder, and that such a check turned up Taylor's outstanding Tennessee warrant, the evidence introduced at the state-court hearing would not lead every reasonable trier of fact to draw the conclusion that this in fact happened. *Ibid.* For this reason, the state court's assessment of the prosecutor's actual and constructive knowledge of Taylor's open warrant was not unreasonable, and Woods cannot show that the State suppressed evidence of Taylor's open Tennessee warrant. *See Strickler*, 527 U.S. at 280–82.

2

Woods's next claim, that due process required the prosecutor to disclose Officer Carlisle's conclusion that Johnson's murder was unrelated to Harris's, was also reasonably adjudicated by the state trial court. The state court gave two reasons for rejecting Woods's bid for a new trial on the basis of Officer Carlisle's conclusion. First, the state court explained that Carlisle's "conclusion" was in reality an opinion that reflected his preliminary thoughts, which were never recorded or revealed to the prosecutor, suggesting that his knowledge could not be imputed to or suppressed by the prosecutor. Second, the state court held that because Woods could have discovered Officer Carlisle's opinion before or during trial, the opinion was not suppressed within the meaning of *Brady*. Because neither conclusion is inconsistent with Supreme Court precedent or the facts of this case, we must defer to the state court's disposition of Woods's second *Brady* claim.

The Supreme Court has repeatedly held that a prosecutor's duty to disclose *Brady* evidence does not depend upon the prosecutor's actual knowledge of that evidence, so long as it is in the possession of anyone "acting on the government's behalf in the case, including the

police." *Kyles*, 514 U.S. at 437. Likewise, the proposition that the unrecorded nature of a fact protects that fact from disclosure under *Brady* is somewhat at odds with Supreme Court precedent, which has never drawn a distinction between recorded and unrecorded statements, and instead distinguishes between evidence that is material and evidence that is not. *See D'Ambrosio v. Bagley*, 527 F.3d 489, 499 (6th Cir. 2008). But as we have recognized, Supreme Court precedent does not require "that every stray thought of a police detective about a case must be imputed to the State, such that the prosecutor has a duty to disclose that information, simply because a defendant could elicit the detective's opinion during trial." *Ibid.*; *see also United States v. Agurs*, 427 U.S. 97, 109 n.16 (1976) ("[T]he State [does not have] an obligation to communicate preliminary, challenged, or speculative information." (quoting *Giles v. Maryland*, 386 U.S. 66, 98 (1967) (Fortas, J., concurring in the judgment))).

Although a "stray thought" is quite different from a "fact," the state trial court did not find that Officer Carlisle's "conclusion" about the identity of Johnson's killer was a "fact." On the contrary, the state court found that it was an "opinion" that "constitute[d] his preliminary suspicion based on the evidence available at that time." This was not an unreasonable appraisal of the evidence introduced at the state evidentiary hearing, where Officer Carlisle provided little information about the basis of his "conclusion" and did not explain the extent to which it was shared by others in DPD. Because no clearly established Supreme Court law compelled the conclusion that an officer's "preliminary suspicion[s]" must be imputed to the prosecution under *Brady*, the state court's analysis did not result in an unreasonable disposition of the claim.

Likewise, the state court's second reason for rejecting Woods's second *Brady* claim—that Woods "had ample opportunity to discover" Carlisle's thoughts about Johnson's death because "Carlisle was available to be called as a witness at trial and defense trial counsel would have

been free to cross examine him on his opinions as [they] pertained to the related or unrelated nature of the two cases"—was also not an unreasonable application of *Brady*'s suppression requirement. Several courts have interpreted *Brady*'s suppression requirement as exempting from the general rule of mandatory disclosure any favorable and material evidence that the defendant could have discovered through the exercise of reasonable diligence. *See, e.g.*, *United States v. Brown*, 650 F.3d 581, 588 & n.10 (5th Cir. 2011) ("[T]o have been suppressed, the evidence must not have been discoverable through the defendant's due diligence." *Id.* at 588.); *Maynard v. Gov't of V.I.*, 392 F. App'x 105, 112 (3d Cir. 2010) (same); *People v. McMullan*, 771 N.W.2d 810, 816 (Mich. Ct. App. 2009) (same). The state trial court reasonably applied this principle to the facts before it when it concluded that Woods could have discovered Officer Carlisle's opinion about Johnson's death by asking him about it during trial.

Relying on the Supreme Court's decision in *Banks v. Dretke*, 540 U.S. 668 (2004), Woods protests that a "diligence" requirement is inconsistent with *Brady*'s rule of disclosure. In *Banks*, the Supreme Court rejected a diligence requirement where the "prosecution represent[ed] that all [*Brady*] material ha[d] been disclosed" to the defendant. *Id.* at 695. But the *Banks* Court did not clearly explain whether courts must apply a diligence requirement in a situation where, as here, there is no evidence that the prosecutor made such a representation. Though we have read *Banks* broadly to repudiate a "diligence" requirement in all *Brady* cases that we consider de novo, *see United States v. Tavera*, 719 F.3d 705, 711–12 (6th Cir. 2015), we have never purported to decide that *Banks* "clearly established" such a rule. *Cf. Ross v. Petro*, 515 F.3d 653, 662 (6th Cir. 2008) (explaining that only those parts of a Supreme Court decision that are "integral to the holding" constitute "clearly established" Supreme Court law for purposes of 28 U.S.C. § 2254(d)). Indeed, given the unique circumstances before the *Banks* Court, other circuits

35

continue to apply a diligence requirement to *Brady* claims that do not involve a prosecutor's misleading representations. *See Brown*, 650 F.3d at 588; *Maynard*, 392 F. App'x at 112. In short, the state trial court's rejection of Woods's second *Brady* claim was consistent with "clearly established" Supreme Court law and the evidence that Woods presented.

3

Woods's third *Brady* claim alleges that the State should have disclosed Officer Zwicker's case notes, in which Zwicker wrote that DPD needed to "round up the witnesses" and "put some pressure on them" with the expectation that "one will admit to Donyelle [Woods] being the 2nd man who came to the house with 'T' and argued with [Harris] prior to the shooting." As we have already mentioned, the state trial court did not explicitly decide whether the prosecutor suppressed Officer Zwicker's case notes, and instead reasoned that the evidence was not material because the prosecutor had already "explained [at trial] that the argument [involving] the decedent earlier on the day of the murder was a viable point of investigation for police, which unfortunately resulted in no evidence to connect Defendant to the argument."

We agree. Even if they would have been admissible as evidence at trial, Officer Zwicker's notes do not, as Woods argues, show that "police had concluded that the shooter *had to* be one of the men from" Harris's heated argument with Hunter and "Big Dog" at the Green House. Appellant Br. 35 (emphasis added). Rather, the notes show Zwicker's preliminary thoughts about the case, suggesting one way of pursuing one avenue of proof. Moreover, the notes would have been largely duplicative because the jury already heard evidence about the argument at the Green House from both Patton and Jennings, and the jury would surely have considered the possibility that Harris's death had something to do with those two men, not Woods. Indeed, Woods's trial counsel explicitly made this very argument at trial. Nor does

Woods show how Zwicker's notes would have "led directly" to other admissible evidence that was not already available to him. *Gumm v. Mitchell*, 775 F.3d 345, 363 (6th Cir. 2014).

Admittedly, it is arguable that Zwicker's reference to "round[ing] up" witnesses and "put[ting] some pressure on them" could have raised some questions about the thoroughness of the DPD investigation in this case, and might have allowed Woods to argue that police pressured Taylor, who was obviously in a vulnerable position given her crack-cocaine addiction. But in the context of this trial, Zwicker's isolated reference to "put[ting] some pressure" on witnesses would simply have reflected ordinary investigatory tactics; many of the State's witnesses—who were presumably among those to be "round[ed] up" and "pressure[d]"—testified that they did not know Woods and had never seen him before. In short, because Zwicker's preliminary notes do not suggest that DPD officers believed that Harris's killer "had to" be either Hunter or "Big Dog," and because they only weakly imply that a less-than-thorough investigation was conducted, their probative value was slight. We thus agree with the state trial court that Officer Zwicker's case notes were not material when they are considered alone.

4

The fourth and last piece of evidence that Woods argues that the State should have disclosed is the DPD report indicating that Harris had serious and violent disagreements with Shaw shortly before he was killed. Though the DPD report is certainly of far greater value to Woods than Zwicker's notes are, it too is not material when considered alone. As mentioned above, the body of the DPD report provided:

> Sister stated [victim] was having major problems with Tameka. Eric had move[d] back to Miss[issippi] on March 20, 2003[.] He came back to Detroit Ap[r]il 7, 2003. When he came back Tameka had another man staying at the house. Tameka would constantly accuse Eric of cheating on her. She was trying to sell Eric's cars while he was in Miss[issippi]. He told Tameka he was going to leave her. He called sister 12 hours before his death and told her he was coming and

37

leaving Tameka that day. Tameka had stabbed Eric in neck area on April 28, 29 or 30th. Eric said Tameka called the police on him that night.

Considering the trial record as a whole, we cannot conclude that the evidence in the report sufficiently weakens the prosecution's case as to undermine confidence in the verdict. As the state court observed, Woods's defense counsel argued at trial that because Harris was a drug dealer, many individuals had an incentive to kill him. This was supported by Gloria Patton's testimony that Harris began to behave erratically after his argument over money with Hunter and "Big Dog," threatening to burn down the Green House because "if I ain't going to have this house, nobody [is] going to." The jury also heard evidence that Johnson was discovered at the scene of the crime with gunpowder residue on his hand. But despite these issues, the jury was apparently convinced by Johnson's and Taylor's identifications of Woods as the perpetrator, and rejected the evidence that suggested that someone else might have committed the murder. In light of the evidence that the jury heard, evidence of the possibility that yet another third party might have had a motive to kill Harris would very likely have had no impact on that verdict at all.

We acknowledge that the DPD report would have had some impeachment value. Assuming that DPD had never investigated Shaw, the report might have allowed Woods to suggest that DPD had conducted an incomplete and hasty investigation into Harris's murder. The report would also have enabled Woods to undermine the prosecution's presentation of Shaw as a stable anomaly in this otherwise troubled community: Shaw had children and a steady job, and testified that although she did not agree with Harris's occupation, she stood by his side because "you can't help who you fall in love with." Raising questions about Shaw's reliability might have enabled Woods to cast some doubt upon the veracity of her statement that Harris had

"arguments with a guy [named] Ferd." Although Woods's counsel successfully objected that this statement was hearsay, the statement was heard by the jury.

But Woods's counsel already contested the credibility of DPD's investigation by drawing the jury's attention to the fact that officers did not conduct Johnson's gunshot-residue analysis until after releasing him and arresting Woods. Moreover, aside from her comment that Harris had "arguments with a guy [named] Ferd," the general focus of Shaw's testimony was to provide background evidence about Harris's occupation and his whereabouts in the hours before his death. Whether impeaching Shaw would have had any impact on the jury's assessment of Woods's motive to kill Harris is also highly speculative because Shaw's testimony on this point was corroborated by Maurice, Harris's cousin, who testified that he saw Woods arguing with Harris over drug territory. Given this, we agree with the state trial court's assessment that "evidence impeaching [Shaw's] testimony" would have been largely "cumulative when the record is viewed as a whole," and thus unlikely to impact the jury's consideration of Woods's guilt.

Most importantly, nothing in the DPD report—or, for that matter, in Clarence Booker's affidavit—calls into doubt the State's most critical evidence against Woods, namely, Taylor's and Johnson's eyewitness identifications of Woods as Harris's killer. Even after acknowledging ancillary inconsistencies in her previous testimony, Taylor consistently maintained that she saw Woods shoot Harris, and her identification was consistent with Johnson's own, as evidenced by the admitted sketch. What is more, the fact that Shaw had a motive to kill Harris says little about whether Woods was involved. *See Thorne v. Timmerman-Cooper*, 473 F. App'x 457, 467 (6th Cir. 2012) ("To be considered material . . . , there must be 'direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' Speculation . . . is not enough."

39

(citations omitted) (quoting *Spirko v. Anderson*, No. 3:95CV7209, 2000 WL 1278383, at *7 (N.D. Ohio July 11, 2000))). Indeed, even if Woods could show that Shaw acted on her motive and orchestrated Harris's murder, that fact is not inconsistent with the State's theory that Woods actually carried out the killing.

5

This leaves the question whether Officer Zwicker's notes add enough to the DPD report to render both material when considered collectively. We have already mentioned that Officer Zwicker's reference to "round[ing] up" and pressuring witnesses weakly implies that DPD's investigation into this case was less than thorough. This could have supported the impeachment value of the DPD report, which, if DPD turned out to have never investigated Shaw as a potential suspect, might have cast some doubt upon whether DPD actually investigated all possible suspects. But as discussed above, the impeachment value of the DPD report alone is far from sufficient to undermine confidence in the result, and Zwicker's notes do not add very much. Nor does the combination of Zwicker's notes and the DPD report in any way call into doubt Taylor's or Johnson's identifications of Woods as the killer. In short, because we are not convinced that the DPD report alone comes close to "undermin[ing] confidence" in the outcome of Woods's trial, *Ritchie*, 480 U.S. at 57, the addition of Officer Zwicker's only slightly favorable notes, which are preliminary and reflect little more than ordinary investigatory tactics, does not create enough doubt either. For this reason, our independent cumulative materiality analysis does not direct a result different from that reached by the state trial court.

V

We recognize that the correctness of the state court's adjudications of Woods's Confrontation Clause and *Brady* claims is open to debate. But "federal habeas relief functions as

a 'guard against extreme malfunctions in the state criminal justice systems,' and not as a means of error correction." *Greene v. Fisher*, 132 S. Ct. 38, 43 (2011) (quoting *Richter*, 562 U.S. at 102). It is thus not enough that we might have reached a different result on direct appeal; we may not grant Woods's petition unless "fairminded jurists" would have to agree that the state court's decision was wrong. *Richter*, 562 U.S. at 101. Because the state court's application of Supreme Court precedent to Woods's Confrontation Clause claim and two of Woods's *Brady* claims was not so patently unreasonable, Woods is not entitled to federal habeas relief on those claims. Although the state court's rejection of Woods's remaining *Brady* claims was contrary to clearly established federal law, after independently reviewing those claims, we conclude that Woods has not met his burden of showing that the prosecutor suppressed material evidence. For these reasons, we must AFFIRM the district court's denial of Woods's habeas petition.